MATSON NAVIGATION COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ALEXANDER AND BALDWIN, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1625–74, 1626–74.   Filed March 16, 1977.

*Hart H. Spiegel* and *Robert C. Livsey,* for the petitioners.
*Vernon R. Balmes,* for the respondent.

OPINION

SIMPSON, *Judge:* The petitioners have made a timely motion for partial summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure. The issues raised by this motion are: (1) Whether Matson Navigation Co. (Matson) can justify its claimed depreciation deductions for its water transportation equipment for the taxable years 1965 through 1969 on the basis of Rev. Proc. 62–21, 1962–2 C.B. 418,[1] as modified by Rev. Proc. 65–13, 1965–1 C.B. 759; (2) whether, if Matson cannot justify its claimed depreciation deductions for such years on the basis of such revenue procedures, it may continue to claim depreciation at a rate previously accepted by the Internal Revenue Service on audit; and (3) whether, if Matson's depreciation is to be adjusted to a rate lower than that previously approved for it, the Commissioner is barred from making any adjustment in excess of that allowed by the minimal adjustment rule of Rev. Proc. 65–13. An extensive stipulation of facts with exhibits was submitted, and the parties have filed briefs in support of their positions.

The Commissioner determined deficiencies in income taxes for the calendar years 1965 through 1969 in the following amounts:

| Year | Deficiency | Year | Deficiency |
|---|---|---|---|
| 1965 | $885,041 | 1968 | $1,152,825 |
| 1966 | 2,899,308 | 1969 | 819,747 |
| 1967 | 189,505 | | |

The deficiencies resulted from the disallowance of depreciation deductions claimed by Matson on some of its vessels and from certain other adjustments not before us on this motion.

---

[1] All references to Rev. Procs. 62–21 and 65–13 are to the pages in the Cumulative Bulletins where such revenue procedures are published.

The petitioners filed timely petitions with this Court, seeking a redetermination of such deficiencies. Alexander & Baldwin, Inc., is involved in this proceeding solely because it filed consolidated returns with Matson for the taxable years 1968 and 1969, and Matson will be referred to as the petitioner.

In disallowing a portion of Matson's claimed depreciation deductions, the Commissioner made adjustments to the useful lives and salvage values claimed with respect to certain of its vessels. Matson's main contention is that the class lives used by it in computing the claimed depreciation deductions on its water transportation equipment were justified on the basis of the reserve ratio test of Rev. Proc. 62–21, as modified by Rev. Proc. 65–13, and that therefore the Commissioner is precluded from disturbing its depreciation deductions. In the alternative, Matson argues that, pursuant to Rev. Proc. 62–21, it is entitled to depreciation deductions based on the class life previously justified on audit. Finally, Matson contends that even if this Court finds that its depreciation deductions were not justified, and does not accept its alternative contention regarding use of the class life previously justified on audit, the Commissioner is nonetheless barred by the minimal adjustment rule of Rev. Proc. 65–13 from making any adjustments to its depreciation deductions.

Matson was audited by the IRS for the calendar years 1962, 1963, and 1964. As a result of such audit, the examining agent proposed adjustments to the depreciation deductions claimed by Matson on three of its vessels, the *Californian,* the *Hawaiian,* and the *Citizen,* by extending their useful lives from 10 to 15 years. Matson filed a protest taking exception to the proposed adjustments to its depreciation deductions on the three vessels and requested a hearing with the Appellate Division. The Appellate Division, after review of the agent's adjustments to the depreciation deductions on the three vessels for the years 1962, 1963, and 1964 and after several conferences with Matson, advised Matson that there was no deficiency. The appellate conferee's report concluded that the taxpayer's arguments in justification of the depreciation claimed, without regard to the application of Rev. Procs. 62–21 and 65–13, had considerable merit. Additionally, the report stated that Matson had satisfied the guideline form of the

reserve ratio test outlined in Rev. Procs. 62–21 and 65–13, and that therefore its depreciation deductions were justified.

The dispute over Matson's depreciation deductions for the taxable years 1962, 1963, and 1964 arose in the context of a modernization program begun by it in 1958. In such year, upon the recommendation of its research department, Matson began a program of conversion to carry containerized cargo; this program involved the overhaul of its fleet, adapting its vessels so that they could carry the containers.[2] Prior to 1960, Matson had modified seven of its vessels to carry containers on deck. In 1960, the *Citizen* was converted to a full container ship, carrying containers in the holds as well as on deck. In such year, Matson also purchased two vessels (the *Californian* and the *Hawaiian*) which it converted to combination bulk cargo carriers and container ships; another vessel, the *Fisherman,* was converted to an auto carrier and renamed the *Motorist.* In 1963, Matson acquired the *Legislator* and converted it to an auto carrier, which could also carry containers on deck. In such year, the *Motorist* was further adapted to carry containers on deck.

Matson's modernization program continued during the years at issue. In 1964, Matson exchanged the *Packer* and the *Retailer* for the *Queen* and the *Monarch,* which were converted into full container vessels and put into service in 1965. The conversion consisted of adding a midbody, removing the intermediate ship decks in the hold, and installing cell guides and cell structures so that the ship was able to carry cargo containers in the hold. The crews' quarters and bridge were relocated on the deck. In 1967, the *Planter* and the *Craftsman* were converted into full container vessels and renamed the *Trader* and the *Banker.* The amounts expended by Matson for the purchase, conversion, and improvement of its vessels, as of the end of each of the years 1964 through 1969, were as follows:

---

[2] Containerization involves the application of trucking industry methods to shipping. A modified truck trailer, called a container, which may be lifted off the trailer chassis, is loaded at the shipper's warehouse, sealed, and sent via truck or railroad flatcar to the container yard at dockside for loading aboard ship. When the vessel arrives at its destination, the process is reversed. Containerization eliminates damage and pilferage and substantially reduces vessel port time.

| Date | Purchase price | Conversions | Other improvements | Total cost[1] |
|---|---|---|---|---|
| 12/31/64................ | $20,937,179 | $33,895,081 | $1,789,832 | $56,622,092 |
| 12/31/65................ | 21,408,126 | 50,029,435 | 1,853,147 | 73,290,708 |
| 12/31/66................ | 21,408,126 | 50,029,435 | 2,156,462 | 73,594,023 |
| 12/31/67................ | 25,055,109 | 57,539,093 | 2,190,648 | 84,784,850 |
| 12/31/68................ | 25,055,109 | 57,539,093 | 2,566,011 | 85,160,213 |
| 12/31/69................ | 24,247,822 | 57,539,093 | 3,322,457 | 85,109,372 |
| Net increase from 12/31/64 to 12/31/69.............. | 3,310,643 | 23,644,012 | 1,532,625 | 28,487,280 |

[1] These figures do not reflect allowances for depreciation.

Matson computed its depreciation deductions on its vessels for the taxable years 1965 through 1969 on the straight-line basis for its books of account and financial statements. For tax purposes, it computed such deductions on the straight-line basis for assets acquired before 1963, and on a combination of the straight-line or the double-declining-balance method for assets acquired in 1963 and thereafter. Matson used individual item accounts for depreciating its water transportation equipment and claimed useful lives for the years 1964 through 1969 as follows:

| Vessel | Matson's estimated useful life in years | Vessel | Matson's estimated useful life in years |
|---|---|---|---|
| SS Lurline ................................ | 12 | SS Hawaiian Queen ................ | 10 |
| SS Hawaiian Rancher............ | 20 | SS Hawaiian Monarch............ | 10 |
| SS Hawaiian Farmer.............. | 20 | Pacific Trader............................ | 21 |
| SS Hawaiian Motorist............ | 10 | (ex SS Hawaiian Planter) | |
| SS Hawaiian Merchant.......... | 20 | Pacific Banker........................... | 21 |
| SS Hawaiian Builder.............. | 20 | (ex SS Hawaiian Craftsman) | |
| SS Hawaiian Citizen............... | 10 | SS Hawaiian Princess............. | 18 |
| SS Hawaiian Refiner.............. | 20 | Barge Islander.......................... | 15 |
| Californian ............................... | 10 | Tug Sevier................................. | 18 |
| SS Hawaiian ............................ | 10 | Tug Doyle | 18 |
| SS Hawaiian Legislator ......... | 10 | | |

In his notices of deficiency, the Commissioner made the following adjustments: (1) The useful lives of the *Motorist* and the *Legislator* were increased from 10 to 18 years, and the salvage value redetermined; (2) the cost to convert the *Monarch* and the *Queen* was extended from 10 to 18 years; (3) the remaining useful lives of the *Banker* and the *Trader* were extended from 6 to 18 years as of 1967, the year of major conversion; and (4) the salvage values of the *Craftsman*, the

*Planter,* the *Lurline,* the *Rancher,* the *Farmer,* the *Merchant,* the *Builder,* and the *Refiner* were redetermined.

The class life correctly computed for Matson's vessels, barges, tugs, and similar water transportation equipment (collectively referred to as vessels), described in guideline class group 1, sec. 2(h), Part I, Rev. Proc. 62–21, for each of the years 1957 through 1969, was as follows:

| Year | Computed class life in years | Year | Computed class life in years |
|------|------|------|------|
| 1957 | 18.52 | 1964 | 13.11 |
| 1958 | 15.65 | 1965 | 12.96 |
| 1959 | 16.24 | 1966 | 12.14 |
| 1960 | 16.70 | 1967 | 11.82 |
| 1961 | 15.21 | 1968 | 11.16 |
| 1962 | 13.83 | 1969 | 10.65 |
| 1963 | 13.34 | | |

A guideline life of 18 years is specified for vessels in such group by such revenue procedure.

The actual reserve ratio for Matson's vessels, and the lower limit of the appropriate reserve ratio range (computed using the tabular form of the reserve ratio test prescribed in Part III, Rev. Proc. 62–21), for each of the taxable years 1964 through 1969 were as follows:

| Year | Actual reserve ratio | Lower limit |
|------|------|------|
| 1964 | 61.10 | 44.26 |
| 1965 | 51.87 | 45.69 |
| 1966 | 62.30 | 44.67 |
| 1967 | 63.01 | 45.12 |
| 1968 | 71.58 | 45.11 |
| 1969 | 78.23 | 48.04 |

Under the guideline form of the reserve ratio test announced in Rev. Proc. 65–13, including the transitional allowances, Matson's actual reserve ratio was within the upper limit of the appropriate reserve ratio range (computed using an extended life equal to 120 percent of the class test life).

The petitioner asks us to decide, in effect, that based upon Rev. Procs. 62–21 and 65–13, it is entitled to judgment as a matter of law. Rule 121, Tax Court Rules of Practice and Procedure; *Julius E. Hoeme,* 63 T.C. 18, 20 (1974); *James T. Shiosaki,* 61 T.C. 861, 862–863 (1974). The Commissioner has not questioned the propriety of the petitioner's motion for

summary judgment but has disputed the petitioner's interpretation of the provisions of those revenue procedures. Thus, the parties have, in effect, agreed that the above revenue procedures are controlling, and we have treated the relevant provisions of such revenue procedures as dispositive of the issues before us. However, we wish to make clear that in so doing, we are not passing upon whether such revenue procedures represent a reasonable interpretation or application of the law.

Section 167(a) of the Internal Revenue Code of 1954 allows as a deduction "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * * of property used in the trade or business." The reasonableness of a taxpayer's depreciation deduction is a question of fact. *Connecticut Light & Power Co. v. United States,* 368 F.2d 233, 242 (Ct. Cl. 1966); cf. *Suil J. Moss,* 38 T.C. 605, 608 (1962); *M. Pauline Casey,* 38 T.C. 357, 381 (1962). In 1953, the IRS announced that it would propose adjustments to a taxpayer's depreciation deduction only where there was a "clear and convincing basis for a change" (Rev. Rul. 90, 1953–1 C.B. 43); yet, the reasonableness of claimed depreciation deductions continued to be the source of controversy between taxpayers and the IRS. The IRS issued Rev. Proc. 62–21, which was designed to provide taxpayers with a greater degree of certainty in determining the amount of their depreciation deductions, and to provide greater uniformity in the audit of such deductions, thereby eliminating needless controversy. Rev. Proc. 62–21 at 429.

The revenue procedure constituted a comprehensive reform of the standards and procedures used in determining allowable depreciation. Part I, Rev. Proc. 62–21, provided guideline lives for approximately 75 broad categories of assets; the guideline lives were based on industry-wide experience as to the useful lives of assets in each such class. Part II provided a detailed description of the procedures to be used in examining a taxpayer's depreciation deductions on audit; more importantly, Part II provided that the depreciation deduction (including useful life and salvage value) claimed by a taxpayer would not be disturbed if certain conditions were satisfied. Part III contained the reserve ratio tables and the adjustment table for class lives. See *Pacific Fruit Express Co.,* 60 T.C. 640,

643 (1973); *Vernon Keith Graves,* 48 T.C. 7, 12 (1967), affd. per curiam 400 F.2d 528 (9th Cir. 1968).

A taxpayer, who prior to the issuance of Rev. Proc. 62–21 was depreciating his assets in item accounts, was permitted to regroup his assets into accounts corresponding to the guideline classes, but was not required to do so. The taxpayer also was permitted to regroup his assets annually, solely for purposes of applying the tests of the revenue procedure (Rev. Proc. 62–21 at 430), as Matson has done in the case before us. Taxpayers were not compelled to use the guideline life for a guideline class, but were permitted to use a life longer or shorter than the guideline life, where appropriate. Moreover, a taxpayer who established a life consistent with the guideline life was not automatically protected from audit adjustments; rather, the taxpayer also was required to demonstrate that the life used was consistent with his actual retirement or replacement practices. The reserve ratio test provided an objective means of demonstrating that the taxpayer's actual retirement and replacement practices justified the life used or a proposed change in the life used. Rev. Proc. 62–21 at 429 n. 2. Application of the revenue procedure was not mandatory; rather, the taxpayer was given the option of having his depreciation deductions examined under the provisions of Rev. Proc. 62–21, or of having his accounts examined under previously established procedures.

If a taxpayer elects to have his depreciation deduction examined under the provisions of Rev. Proc. 62–21, as the petitioner has done in the case before us, the first step is to determine the class life used by the taxpayer. In the case of a taxpayer depreciating assets in item accounts, the assets are first regrouped in classes corresponding to the prescribed guideline classes; the class life for each class is then determined by computing the weighted average of the lives used for the item accounts coming within the guideline class. Rev. Proc. 62–21 at 434. The next step is to compute the taxpayer's actual reserve ratio, that is, the ratio of the depreciation reserves for the assets in a guideline class to the basis of such assets. The tables in Part III, Rev. Proc. 62–21, establish the theoretically appropriate reserve ratio for the assets in a guideline class, taking into account the method of depreciation used by the taxpayer and the rate of growth of

his accounts for a guideline class. The tables also establish appropriate reserve ratio ranges, prescribing acceptable upper and lower limits. Rev. Proc. 62–21 at 440–442. The upper limit of the appropriate reserve ratio range includes a 20-percent tolerance, and the lower limit, a 10-percent tolerance. Thus, the actual reserve ratio for a taxpayer who is in fact replacing his assets at a rate 20 percent slower than is consistent with the life used will nonetheless fall within the upper limit of the appropriate reserve ratio range. Likewise, a taxpayer may be replacing assets at a rate 10 percent faster than is consistent with the life used, yet his actual reserve ratio will not fall below the lower limit of the appropriate reserve ratio range. Answer 28, Rev. Proc. 62–21 at 470–471. In essence, the reserve ratio test provides an objective, yet not rigid, means of determining whether the taxpayer's actual retirement and replacement practices are consistent with the rate at which assets are being depreciated for tax purposes.

Part II, Rev. Proc. 62–21, provides detailed procedures to be followed in examining depreciation deductions. Section 2 of Part II provides the standards to be applied where the class life used by the taxpayer is equal to or longer than the guideline life for a guideline class, whereas section 3 applies where the class life used by the taxpayer is shorter than the guideline life for a guideline class. In the case before us, the parties have stipulated the correctly computed class life for each of the years in issue and also have stipulated that such class life is shorter than the applicable guideline life; hence, section 3 is applicable. Subsection .02 of section 3 applies where the class life used by the taxpayer is equal to or longer than the class life used in the immediately preceding taxable year, while subsection .03 of section 3 applies where the class life used by the taxpayer is shorter than the class life used for the preceding taxable year. As the parties have also stipulated that the class life used by the petitioner for each of the taxable years 1965 through 1969 is shorter than the class life used for each of the preceding taxable years, section 3.03 is the proper provision to be applied in examining the petitioner's depreciation deductions.

Section 3.03, Part II, Rev. Proc. 62–21 at 432, provides:

.03 Class life shorter than life used in preceding year.—Where the class life used by a taxpayer is shorter than the guideline life for a guideline class

and is also shorter than the class life used by the taxpayer in the immediately preceding taxable year, the depreciation deduction claimed by the taxpayer will not be disturbed if either paragraph (a) or (b) of this subsection applies.

(a) Class life justified by prior retirement and replacement practices.— The depreciation deduction will not be disturbed if the taxpayer's prior retirement and replacement practices indicate that such shorter class life is justified, as demonstrated by the following factors:

(1) the taxpayer's reserve ratio for the guideline class for the taxable year immediately preceding the taxable year under examination *was below the lower limit of the appropriate reserve ratio range;* and

(2) the taxpayer has used approximately the same class life as the life used in such immediately preceding year for a period of years equal to at least one-half of the class life used in such preceding year; and

(3) the shorter class life used in the taxable year under examination is not shorter than can be justified on the basis of the Adjustment Table for Class Lives.

(b) Class life justified by other factors.—The depreciation deduction will not be disturbed if the class life used by the taxpayer is justified for the taxable year under examination on the basis of all the facts and circumstances * * *

[Fn. refs. omitted; emphasis supplied.]

In its opening brief, the petitioner asserts as its main contention that the fact that its reserve ratio falls within the *upper limit* of the appropriate reserve ratio range (utilizing the transitional allowance of Rev. Proc. 65–13) demonstrates that its retirement and replacement practices are consistent with the class life used by it. However, such argument ignores the provisions of section 3.03. Under that provision, the fact that the petitioner's reserve ratio falls below the upper limit of the reserve ratio range is irrelevant: The provision clearly states that a taxpayer seeking to justify a class life which is shorter than the class life used by the taxpayer in the immediately preceding taxable year must demonstrate that his actual reserve ratio for the immediately preceding taxable year was *below the lower limit* of the appropriate reserve ratio range. In effect, a taxpayer can justify a class life shorter than that used in the preceding taxable year if the reserve ratio indicates that he has been depreciating assets too slowly. Such is not the case before us, as the petitioner's actual reserve ratio did not fall below the lower limit of the appropriate reserve ratio range (computed in accordance with Rev. Proc. 62–21) for any of the taxable years 1964 through 1968. Accordingly, we find that the petitioner has failed to

demonstrate that the class lives used by it for the taxable years 1965 through 1969 were justified by its prior retirement or replacement practices, pursuant to section 3.03(a), Part II, Rev. Proc. 62–21. The issue of whether the class lives used by the petitioner are justified on the basis of all the facts and circumstances, pursuant to section 3.03(b), is not before us on this motion.[3]

The petitioner contends, in the alternative, that it is entitled to depreciation deductions for each of the years at issue, based upon the class life of 13.11 years, which was accepted by the IRS on audit of its 1964 return. Section 3.05, Part II, Rev. Proc. 62–21 at 433, provides in part:

> .05 Subsequent use of class life previously justified.—Where the class life used by a taxpayer was examined by the Internal Revenue Service and was accepted by reason of subsection .02, .03, or .04 of this section, or where such class life was accepted on audit by the Internal Revenue Service under presently established procedures for examining depreciation (whether before or after the effective date of this Revenue Procedure), the depreciation deduction claimed by the taxpayer for the assets in that class in any subsequent taxable year based on that class life will not be disturbed if the taxpayer's retirement and replacement practices for that class are consistent with the class life being used. This consistency may be demonstrated either by the reserve ratio test set forth in section 5 of this Part or by all the facts and circumstances.

In further support of its argument that it is entitled to continue to use the class life previously justified by it, Matson also relies on section 6.03, Part II, Rev. Proc. 62–21 at 437. Such section sets forth rules for lengthening a shorter than guideline class life and provides that the class life used by the taxpayer may be lengthened in accordance with the adjustment table for class lives, or to the shortest life previously justified for the class.

---

[3] The Commissioner argued on brief that Matson had not used approximately the same class life for a period of years equal to at least half a replacement cycle, as required by sec. 3.03(a)(2). The fact that a taxpayer's reserve ratio falls below the lower limit of the appropriate reserve ratio range is not meaningful for purposes of justifying a shorter than guideline class life unless: (1) The guideline class has a history equal in years to the guideline life for that class; and (2) the taxpayer has used approximately the same class life for a substantial period of years. Rev. Proc. 62–21 at 432 nn. 5 and 6. Since the taxpayer's reserve ratio never fell below the appropriate lower limit, as required by sec. 3.03(a)(1), we find it unnecessary to reach this issue.

Although the Commissioner maintained earlier in these proceedings that the class life used by Matson was not accepted on audit for the taxable years 1962, 1963, and 1964, he has since abandoned that position, and now agrees that a class life of 13.11 years was accepted for 1964.[4] However, he argues that Matson may not rely upon its previously justified class life, because of his announcement in Rev. Proc. 68–27, 1968–2 C.B. 911, 912, that—

In situations in which the relative proportions of the different types of assets in an account are in fact substantially altered by subsequent additions, retirements, or replacements to the account, a previously justified shorter than guideline class life holds no significance and section 3.05, Part II, of Revenue Procedure 62–21 is not applicable.

The Commissioner argues that during the 5-year period at issue, Matson made major changes in the relative proportions of the different types of assets, and that although a class life of 13.11 years may have been appropriate based on assets in existence as of December 31, 1964, it is not justified for the years at issue. In support of his contentions, the Commissioner points out that as of December 31, 1964, Matson's total investment in its vessels was approximately $56.6 million, whereas by December 31, 1969, its investment had increased by approximately 50 percent, to $85 million. Of the $28.5 million expended, only $3.3 million was for the purchase of additional assets, whereas $23.6 million was expended for major modifications or conversions of existing vessels. He asserts that such facts show that Matson did not spend money merely replacing old assets; rather, it spent substantial sums in converting previously unsuitable or inadequate vessels and thereby caused a shift in the relative proportions of types of assets in the class.

Rev. Proc. 68–27 further provides that whether there has been a substantial alteration in the relative proportions of the different types of assets in an account is a question of fact to be determined in accordance with the principle enunciated in

---

[4] According to the appellate conferee's computations, the class life justified for 1964 was 13.22 years. However, such computations were in error, and the depreciation deductions claimed by the petitioner in fact resulted in a correctly computed class life in 1964 of 13.11 years, as stipulated by the parties.

example 2 of section 1.167(b)–1(b), Income Tax Regs., which provides in relevant part:

In the case of classified or composite accounts, the classified or composite rate is generally computed by determining the amount of one year's depreciation for each item or each group of similar items, and by dividing the total depreciation thus obtained by the total cost or other basis of the assets. The average rate so obtained is to be used as long as subsequent additions, retirements, or replacements do not substantially alter the relative proportions of different types of assets in the account. * * *

Once the proper rate of depreciation for such an account has been established, the taxpayer is entitled to continue using such rate unless some change in circumstances requires an adjustment in such rate. For example, a taxpayer who demonstrates that assets in an account would be obsolete before the end of the useful life on which the rate originally was based may be entitled to change to a higher rate of depreciation. Cf. *Morganton Full Fashioned Hosiery Co.*, 14 T.C. 695, 702–704 (1950); *Hoyt B. Wooten,* 12 T.C. 659, 665 (1949), affd. per curiam 181 F.2d 502 (6th Cir. 1950). On the other hand, the taxpayer is not entitled to continue using the same rate if the useful life on which that rate was based has been extended.

Although the petitioner vigorously argues that retroactive application of Rev. Proc. 68–27 is inequitable, it cites no legal authority in support of this argument and, in fact, has conceded on brief that "We do not suggest that respondent was without authority to modify his previous Rev. Procs. 62–21 and 65–13." The petitioner does maintain that Rev. Proc. 68–27 relates only to the application of section 3.05, Part II, Rev. Proc. 62–21. It does not apply, the petitioner asserts, to the rules for lengthening the class life prescribed in section 6.03, Part II, Rev. Proc. 62–21, and there is no justification for extending it beyond its literal terms. Thus, the petitioner contends that although it may not be entitled to rely on its previously justified class life, the Commissioner is nevertheless precluded from a lengthening adjustment which would extend the class life beyond that previously justified. However, such an interpretation of Rev. Proc. 68–27 appears to be unwarranted. Its restriction on the use of a previously determined class life appears to be equally applicable for the purpose of section 3.05 and for the purpose of section 6.03, and

it seems clear that the Commissioner intended for the restriction to be applicable for both purposes.

The petitioner argues further that in any event, the conditions of Rev. Proc. 68–27 are satisfied in this case. The petitioner points out that throughout the period in issue it had 14 freighters, and that the basic structure (the hulls and the propulsion machinery) remained unchanged. The petitioner asserts that although the cost of its modernization program was great, the type of asset was not substantially altered. By this argument, the petitioner is in effect maintaining that modification did not alter the physical useful life of its vessels. However, such argument is not in point; the question is whether conversion to containerized cargo so affected the economic usefulness of its vessels as to constitute a substantial alteration of the types of assets within the class. Cf. *Massey Motors, Inc. v. United States*, 364 U.S. 92 (1960).

The only evidence before us as to the economic useful lives of the converted vessels consists of the petitioner's assertions, which are vigorously disputed by the Commissioner. The petitioner, as the moving party, has the burden of proving that there is no dispute about the facts of the case. *James T. Shiosaki*, 61 T.C. 861, 863 (1974). Since we are unable to determine from the record before us whether there has been a substantial alteration in the petitioner's vessel account, within the meaning of Rev. Proc. 68–27, we find that as to the taxable years 1965, 1966, and 1967, there is a material issue of fact (sec. 1.167(b)–1(b), example (2), Income Tax Regs.), which precludes our granting its motion for summary judgment with respect to the use of the class life approved by the Commissioner for 1964. Rule 121, Tax Court Rules of Practice and Procedure. However, it is clear from the record that no substantial alterations in the vessel account took place during the taxable years 1968 and 1969, as no modifications or conversions were undertaken during such years. Therefore, we agree with the petitioner that, under section 3.05, Part II, Rev. Proc. 62–21, it may continue to use, for the taxable years 1968 and 1969, whatever class life ultimately is determined to be justified for the taxable year 1967, provided its reserve ratios for 1968 and 1969, computed on the basis of such class life, fall within acceptable limits.

Matson's final contention is that the minimal adjustment rule of Rev. Proc. 65–13 precludes any adjustment to its depreciation deductions for the taxable years 1965 through 1969, notwithstanding the fact that such deductions are not justified under any provision of Rev. Procs. 62–21 and 65–13, or that at least, such rule limits the adjustments that can be made. Rev. Proc. 65–13 added three new measures to the depreciation guidelines and rules of Rev. Proc. 62–21. A new method, called the guideline form of the reserve ratio test, was announced as an optional alternative to the tabular form of the reserve ratio test prescribed in Rev. Proc. 62–21; the purpose of such new method was to provide the taxpayer with a means of computing a reserve ratio upper limit based upon his individual circumstances. Rev. Proc. 65–13 at 761. A transitional allowance rule was announced, which raised the reserve ratio upper limit for the transitional period.[5] Rev. Proc. 65–13 at 767. A minimal adjustment rule also was prescribed, which was designed to minimize the lengthening of a class life in cases where the reserve ratio test is not met. Rev. Proc. 65–13 at 768.

Section 7, Part II, Rev. Proc. 65–13, provides rules to be applied where the class life used by a taxpayer for a guideline class is shorter than the class life used by the taxpayer for the immediately preceding taxable year, or the class life previously justified. Section 7.03, which is applicable to the case before us, provides at pages 771–772:

.03 If the shortened class life is shorter than the guideline life for the guideline class, the depreciation deduction for such class will not be disturbed if factors (1), (2), and (3) of section 3.03(a) of Part II of Revenue Procedure 62–21 are present. For purposes of this section, if the taxpayer uses the guideline form, "the lower limit of the appropriate reserve ratio range" shall equal a reserve ratio upper limit computed under the guideline form using an extended life equal to 90 percent of the test life.

The effect of such provision is to continue the rules of Rev. Proc. 62–21 with respect to automatic justification of a shortened class life. The taxpayer may rely upon either the tabular form of the reserve ratio test, computed in accordance

---

[5] The transitional period for a guideline class begins with the fourth taxable year to which Rev. Proc. 62–21 applies (1965 for most taxpayers) and continues for a period equal to the guideline life for that class. Rev. Proc. 65–13 at 767.

with Rev. Proc. 62–21, or the guideline form of Rev. Proc. 65–13.

The record before us clearly demonstrates that the taxpayer's actual reserve ratio never fell below the lower limit of the appropriate reserve ratio range, using the tabular form prescribed in Rev. Proc. 62–21, and the petitioner does not contend that its actual reserve ratio fell below the upper limit of the guideline form computed using an extended life equal to 90 percent of the test life,[6] as prescribed in Rev. Proc. 65–13. Accordingly, the petitioner has failed to demonstrate that its class lives for the taxable years 1965 through 1969 were justified on the basis of section 7.03, Part II, Rev. Proc. 65–13. However, the petitioner argues that the Commissioner is nonetheless precluded from making any adjustments to its depreciation deductions by virtue of the minimal adjustment rule of Rev. Proc. 65–13.

Section 7.04, Part II, Rev. Proc. 65–13 at 772, provides in part:

.04 If neither section 7.02 nor 7.03 of this Part applies and if the shortened class life cannot be justified on the basis of all the facts and circumstances, the class life shall be lengthened as provided in section 4, 5, or 6 of this Part, whichever is appropriate * * *

The petitioner argues that neither section 5 nor section 6 is applicable, and we agree. Section 4, the minimal adjustment rule, provides limitations on adjustments by the IRS. Section 4.01 provides that under the minimal adjustment rule, class lives will not be lengthened by more than 10 percent in any taxable year. Section 4.02 provides rules for lengthening the class life. Section 4.02(a) gives the rule to be applied where the actual reserve ratio exceeds the transitional upper limit by 10 or more percentage points, whereas section 4.02(b) provides the rule to be applied where the excess is less than 10 percentage points. Rev. Proc. 65–13 at 768. The petitioner contends that since its actual reserve ratio never exceeded the transitional upper limit, neither the rule of (a) nor of (b) is applicable, and therefore, the Commissioner is precluded from making any adjustments to its depreciation deductions.

---

[6] The effect of this formula is to provide a guideline form reserve ratio lower limit, with a 10-percent tolerance similar to that contained in the reserve ratio tables of Rev. Proc. 62–21.

Section 7, Part II, Rev. Proc. 65–13, makes clear that a taxpayer seeking to use the reserve ratio test to justify a class life which is both shorter than the guideline life and shorter than the class life previously justified must continue to do so on the basis of the three-part test of section 3.03, Part II, Rev. Proc. 62–21. Such section 7 also provides that if its conditions are not satisfied, the class life shall be lengthened. The requirement for an adjustment would be nullified if we were to adopt the interpretation urged by the petitioner. Considering the scheme of the revenue procedures and all the provisions thereof, it seems clear that some adjustment in the depreciation deductions is required if the conditions of section 3.03, Part II, Rev. Proc. 62–21, and section 7, Part II, Rev. Proc. 65–13, are not satisfied, and therefore, we reject the petitioner's proposed interpretations.

On the other hand, we can perceive no reason, nor has the Commissioner given one, why the general provisions of the minimal adjustment rule should not be applied in the case before us. Under that provision, the class life shall not be lengthened more than 10 percent in any taxable year, and in any event, shall not be lengthened beyond the shortest life which can be justified under all the facts and circumstances. Accordingly, if the petitioner is unable to demonstrate that it is entitled to continue using a class life of 13.11 years under section 3.05, Part II, Rev. Proc. 62–21, as modified by Rev. Proc. 68–27, its class life for the taxable year 1965 may be lengthened by the Commissioner in accordance with the procedure outlined in section 4.02(a), Part II, Rev. Proc. 65–13. The class life so adjusted may also be used for the taxable year 1966. See sec. 4.03, Part II, Rev. Proc. 65–13 at 768–769. For the taxable year 1967, the petitioner may use the same class life as it used for 1966 if it can demonstrate as a matter of fact that there was no substantial change in the relative proportions of the assets in the class in that year. If the petitioner cannot establish such fact, then it will be necessary to make an additional adjustment in the class life used by it in accordance with section 4.02(a), Part II, Rev. Proc. 65–13.

In conclusion, the petitioner is not entitled to a summary judgment that under Rev. Procs. 62–21 and 65–13, no adjustment is to be made in the depreciation claimed by it for the years 1965 through 1969. Nor is the petitioner entitled to

a summary judgment that for such years it is entitled to use the class life of 13.11 years which had been approved for its use in 1964. The petitioner is free to establish that on the basis of all the facts and circumstances, the depreciation claimed by it was allowable under section 167(a) of the Internal Revenue Code of 1954. Alternatively, under section 3.05, Part II, Rev. Proc. 62–21, as modified by Rev. Proc. 68–27, the petitioner may establish as a matter of fact that there has been no substantial alteration in the relative proportions of the assets in its depreciation account and that therefore it is entitled to use the class life of 13.11 years for the taxable years 1965 through 1969. If it does not establish that there has been no such alteration in the account, then the Commissioner may make adjustments in the depreciation account for the taxable years 1965, 1966, and 1967 in accordance with sections 4.02 and 4.03, Part II, Rev. Proc. 65–13. For the taxable years 1968 and 1969, no further adjustment is required, provided the petitioner continues to meet the reserve ratio test in accordance with section 3.05, Part II, Rev. Proc. 62–21. Accordingly, the petitioner's motion for summary judgment will be granted in part and denied in part.

*An appropriate order will be issued.*