BRIARCLIFF CANDY CORPORATION AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Briarcliff Candy Corp. v. Commissioner
Docket No. 5415-82.
United States Tax Court
T.C. Memo 1987-487; 1987 Tax Ct. Memo LEXIS 483; 54 T.C.M. (CCH) 667; T.C.M. (RIA) 87487; September 28, 1987. *483 P, a loss corporation, acquired G, a group of profitable corporations. P filed consolidated returns with G for the taxable years ended June 30, 1974 and 1975, and deducted its preacquisition losses against the profits of G. R disallowed deduction of the losses, determining under section 269 that P acquired G for the principal purpose of evading or avoiding Federal income tax by securing the deduction of losses which P would otherwise have been unable to use. P moved for summary adjudication that section 269 does not apply to the acquisition. Held,section 269(a) applies to the acquisition by a loss corporation of a profitable subsidiary. Held further, a question of material fact exists as to whether the acquisition of G by P had substance. Held further, whether a transaction was undertaken for the principal purpose of evading or avoiding Federal income tax is a question of material fact. Held further, P's Motion for Summary Judgment is denied. *484 Leon Baker and Ellis Reemer, for the petitioners. Anne Hintermeister, for the respondent. PANUTHOS
MEMORANDUM OPINION *485 PANUTHOS, Special Trial Judge: This case is before the Court on petitioners' Motion for Summary Judgment. [1] The sole issue for decision is whether section 269 applies to the acquisition by Briarcliff Candy Corporation (Briarcliff), a corporation with substantial net operating losses, of Health-Med Corporation (Health-Med) and its subsidiaries, so as to disallow deduction of the net operating losses against profits from Health-Med and its subsidiaries. [2]
*486 FACTUAL BACKGROUND Briarcliff is a New York corporation, having its principal office in Philadelphia, Pennsylvania. [3] In 1941, Bankers Securities Corporation acquired more than 50 percent of the stock of Briarcliff. [4] In 1970, Bankers Securities Corporation contributed 15,000 shares of Briarcliff stock to Thomas Jefferson University. After the contribution, Bankers Securities Corporation owned approximately 49.9 percent of the outstanding shares of Briarcliff. The remaining shares were publicly held and traded in the over-the-counter market. Briarcliff operated a candy factory and a chain of candy shops. It also sold franchises to independent store owners to operate candy shops under the Loft name. [5] Due to competitive pressures, it became increasingly difficult for Briarcliff to profitably operate its candy stores. With profit margins narrowed, Briarcliff found it *487 increasingly difficult to pay salaries sufficient to retain competent store managers and salespersons. Apparently, the only profitable segment of Briarcliff's business was supplying candy to franchisees. Therefore, Briarcliff sold many company-owned stores to franchisees and closed shops which it could not sell. [6] Prior to and in the course of selling and closing down its own candy stores, Briarcliff had incurred net operating losses which were available for carryover to the taxable years ended June 30, 1974 and June 30, 1975 as follows: [7]
Loss Incurred
In and
Carried Over
From Taxable
To Taxable Year Ended
To Taxable Year Ended
Year Ended
June 30, 1974
June 30, 1975
June 30, 1969
[8] $ 2,237,465
$ -0-   June 30, 1970
3,309,808     3,138,459  June 30, 1971
3,432,409     3,432,409  June 30, 1972
458,511       458,511    TOTAL CARRY FORWARD
$ 9,438,193   $ 7,029,379
*488 In 1973, Briarcliff entered into negotiations with a group of corporations consisting of Eckmar Corporation (Eckmar), Eckmar HDC Corporation (HDC), Health-Chem Corporation (Health-Chem) and Medallion Leisure Corporation (Medallion). Eckmar owned a majority interest in HDC and 80 percent of the stock of Medallion. HDC owned approximately 82 percent of the stock of Health-Chem. As a result of these negotiations, on August 10, 1973, Eckmar, HDC, and Briarcliff entered into an agreement whereby HDC agreed to change its name to Health-Med Corporation (Health-Med) and undergo a recapitalization. After the recapitalization, the authorized stock of Health-Med would consist of 15,000 preferred shares, 4,000 junior preferred shares, and 800,000 common shares. As part of the recapitalization, Eckmar would exchange the 1,000,000 shares of HDC common stock it held prior to the recapitalization for 2,800 shares of Health-Med junior preferred stock. Eckmar would also transfer its 866,000 shares of preferred and 600,000 shares of common stock in Medallion to Health-Med in exchange for an additional 1,200 Health-Med junior preferred shares. Briarcliff would purchase 40,000 Health-Med common *489 shares for $ 100,000, which would constitute all of the then outstanding Health-Med common shares. Thus, after the closing, Eckmar would own 4,000 shares of Health-Med junior preferred stock and approximately 500 shares of preferred stock, and Briarcliff would own 40,000 shares of Health-Med common stock. [9] As a result, Eckmar would hold stock possessing approximately 10 percent of the total combined voting power of all shares entitled to vote and Briarcliff would hold stock possessing approximately 90 percent of the total combined voting power. [10]
Each share of junior preferred stock would be convertible to Health-Med common stock, at Eckmar's option, after the earliest of: (1) commencement of voluntary or involuntary bankruptcy proceedings by or against Briarcliff; (2) adoption by Briarcliff of a plan of liquidation; *490 or, (3) December 31, 1980. The conversion ratio of the junior preferred stock would give Eckmar as much as 95 percent of the total combined voting power of all Health-Med shares entitled to vote. Further, each junior preferred share would be redeemable by Health-Med for $ 10,000 per share at Health-Med's option, and commencing in 1988, Health-Med would be required to redeem these shares on an annual basis. This transaction was closed on August 17, 1973. After the closing, Briarcliff, Health-Med, Health-Chem, and Medallion entered into an agreement to file consolidated Federal income tax returns. Under the terms of the agreement, Health-Med agreed to pay Briarcliff an amount equal to 21 percent of the excess of the amount of Federal income taxes that Health-Chem and subsidiaries, and Medallion and subsidiaries, would have paid for each taxable period had they filed consolidated returns as two distinct groups, over the actual Federal income tax liability under a consolidated return filed with Briarcliff for the same taxable period. Briarcliff joined in the filing of consolidated returns with Health-Med, Health-Chem, and Medallion for the taxable years ended June 30, 1974 and June 30, 1975. *491 On the consolidated returns for 1974 and 1975, they claimed deductions of $ 9,596,729 and $ 7,187,915, respectively, attributable to net operating loss carryovers of Briarcliff. [11] On December 15, 1981, respondent issued a notice of deficiency determining deficiencies for the taxable years ended June 30, 1974 and 1975 in the amounts of $ 1,112,861 and $ 1,565,796, respectively. The deficiencies resulted, in part, from respondent's determination that the net operating loss deductions should be disallowed. Respondent determined that such deductions were not allowable because Briarcliff had acquired a controlling interest in the stock of Health-Med for the principal purpose of evading or avoiding Federal income tax by securing the benefit of a deduction which the corporation would not otherwise have enjoyed, within the meaning of section 269 of the Internal Revenue Code. [12] Pursuant to the notice of deficiency, a petition was filed with this Court. *492 DISCUSSION Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials of "phantom factual questions." Cox v. American Fidelity and Casualty Co.,249 F.2d 616, 618 (9th Cir. 1957); Shiosaki v. Commissioner,61 T.C. 861, 862 (1974). Summary judgment is not a substitute for trial, in that disputes over factual issues are not to be resolved in such proceedings. Naftel v. Commissioner,85 T.C. 527 (1985); Espinoza v. Commissioner,78 T.C. 412, 416 (1982); Mattson Navigation Co. v. Commissioner,67 T.C. 938 (1977); Giordano v. Commissioner,63 T.C. 462 (1975). Rule 121(a) provides that "Either party may move, with or without supporting affidavits, for a summary adjudication in his favor upon all or any part of the legal issues in controversy." Rule 121(b) provides: An opposing written response, with or without supporting affidavits, shall be filed within such period as the Court may direct. A decision shall thereafter be rendered if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together *493 with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. * * * The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. Weinburger v. Hynson, Westcott, and Dunning, Inc.,412 U.S. 609, 622 n. 18 (1973); Adickes v. S. H. Kress and Co.,398 U.S. 144, 157 (1970). Section 269 as applicable to this transaction provides as follows: (a) IN GENERAL. -- If -- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the secretary may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the *494 total value of shares of all classes of stock of the corporation.
In order for section 269 to apply to this transaction, there must be the acquisition of control of a corporation, and the principal purpose of such acquisition must be the "evasion or avoidance of Federal income tax by securing the benefit of a deduction * * * which such person or corporation would not otherwise enjoy." Section 269(a); Vulcan Materials Co. v. United States,446 F.2d 690, 696-697 (5th Cir. 1971). However, before we consider these requirements, we must address petitioners' argument that section 269 does not apply to a loss corporation's acquisition of a profitable subsidiary. Petitioners contend that respondent recognizes that section 269 does not apply to a loss corporation's acquisition of a profitable subsidiary, and that respondent stated, in Rev. Rul. 63-40, 1963-1 C.B. 46, that Libson Shops, Inc. v. Koehler,353 U.S. 382 (1957) will not be applied in a situation where there is "no more than a minor change in stock ownership of a loss corporation." Thus, petitioners argue that since there was no change in ownership of Briarcliff, the loss corporation, *495 neither Libson Shops nor section 269 apply to the transaction. Libson Shops did not involve a question of tax avoidance, and thus as expressly noted by the Supreme Court, section 129 of the 1939 Code, the predecessor of section 269 of the 1954 Code, [13] was not applicable. Libson Shops, Inc. v. Koehler, supra at 388-389; see also Thomas E. Snyder Sons Co. v. Commissioner,34 T.C. 400, 407 (1960), affd. 288 F.2d 36 (7th Cir. 1961). In contrast, here respondent has determined that Briarcliff acquired Health-Med for the principal purpose of evading or avoiding Federal income tax, and that section 269 applies. Accordingly, Libson Shops is not dispositive of the issue of whether section 269 applies to the transaction involved here. [14]
*496 This Court and others have held that section 269 applies where a loss corporation acquires control of a profitable corporation since the acquiring corporation thereby secures the benefit of a loss it would not otherwise have enjoyed. Vulcan Materials Co. v. United States,446 F.2d 690, 698 (5th Cir. 1971); Southland Corp. v. Campbell,358 F.2d 333, 336 (5th Cir. 1966); F.C. Publication Liquidating Corp. v. Commissioner,304 F.2d 779, 781 (2d Cir. 1962), affg. 36 T.C. 836 (1961); Temple Square Manufacturing Co. v. Commissioner,36 T.C. 88, 93 (1961). Further, the legislative history of section 129 of the Internal Revenue Code of 1939[15] supports the proposition that section 269 is not limited to any particular form of transaction (e.g., the acquisition by a loss corporation of a profitable subsidiary). Rather, this section was broadly drafted to include any type of acquisition which constitutes a device by which one corporation secures a tax benefit to which it is otherwise not entitled: * * * Thus, the acquisition may be an acquisition of the shares of a corporation, or it *497 may be an acquisition which follows by operation of law in the case of a corporation resulting from a statutory merger or consolidation. The person, or persons, making the acquisition likewise vary, as do the forms or methods of utilization under which tax avoidance is sought. Likewise, the tax benefits sought may be one or more of several deductions or credits, including the utilization of excess profits credits, carryovers, and carrybacks of losses or unused excess profits credits, and anticipated expense of other deductions. In the light of these considerations, the section has not confined itself to a description of any particular methods for carrying out such tax avoidance schemes, but has included within its scope these devices in whatever form they may appear. For similar reasons, the scope of the terms used in this section is to be found in the objective of the section, namely, to prevent the tax liability from being reduced through the distortion or perversion effected through tax avoidance devices. * * * H. Rept. No. 871, to accompany H.R. 3687 (Pub. L. 235), 78th Cong., 1st Sess. 49 (1943), 1944 C.B. 901, 938. Petitioner attempts *498 to distinguish Vulcan Materials Co. v. United States, supra;Southland Corp. v. Campbell, supra; F.C. PublicationLiquidation Corp. v. Commissioner, supra, [16] on the basis that a change in control of the loss corporation required disallowance of deductions under section 269. Any change of control of the loss corporation was not the factor controlling the decisions in those cases. Rather, they were decided on the basis of the essence of section 169, that is, whether the acquisition was made for the principal purpose of evading or avoiding Federal income tax. It is well settled that a corporation may acquire another corporation for a business purpose, and in doing so, may structure the transaction so as to minimize its tax liability. See Gregory v. Helvering,293 U.S. 465 (1935). However, by mandate of Congress, a corporation may not acquire another corporation for the principal purpose of evading or avoiding Federal income *499 tax by securing the benefit of a deduction to which it would otherwise not be entitled. Vulcan Materials Co. v. United States, supra at 698; Thomas E. Snyder Sons Co. v. Commissioner, supra at 406. Respondent has determined that the principal purpose of the acquisition was to evade or avoid Federal income tax, by securing the deduction of net operating losses that Briarcliff would have otherwise been unable to use. Respondent's determination is presumed correct and petitioners bear the burden of proving otherwise. Rule 142; Welch v. Helvering,290 U.S. 111 (1933); American Pipe and Steel Corp. v. Commissioner,25 T.C. 351, 366 (1955), affd. 243 F.2d 125 (9th Cir. 1957). Having determined that section 269 can apply to a loss corporation's acquisition of a profitable subsidiary, we must next decide whether under the particular circumstances here, petitioners are entitled to summary judgment. If we find that, as a matter of law, the requirements for disallowance of a deduction under section 269 have not been met, then that section will not be applicable to this transaction and petitioners will *500 be entitled to summary judgment. However, if we find that there are unresolved questions as to any material facts, then petitioners' motion must be denied. One requirement under section 269 is that there must be an acquisition of control. It appears that Briarcliff has met the definition of "control" in section 269 in that Briarcliff owns "at least 50 percent of the total combined voting power of all classes of stock entitled to vote." Section 269(a). However, while Briarcliff appears to have met the form of the statute, we believe there exists a material question as to whether the acquisition of control had substance. Respondent submitted several exhibits with his opposition to petitioners' motion. These exhibits raise the question of whether, notwithstanding the ownership of a majority of the voting power, Briarcliff lacked effective control over the business and management of Health-Med and its subsidiaries. In particular, these exhibits show that at a November 14, 1973 annual meeting of Briarcliff shareholders, the shareholders were informed that because of Eckmar's ownership of convertible securities in Health-Med and other factors, "effective managerial control of Health-Med *501 remains in Eckmar." In a report of Briarcliff's financial condition, the shareholders were again advised Eckmar retained control over Health-Med and its subsidiaries due to conversion rights of the preferred stock, the initial composition of Health-Med's board of directors and the respective rights of the various classes of its securities. Briarcliff never prepared consolidated financial statements with Health-Med and its subsidiaries, rather Eckmar continued to include the results of these entities in its consolidated financial statements. Further, for the year ended June 28, 1975, [17]Briarcliff filed a Form 10-K with the Securities and Exchange Commission in which Briarcliff did not report Health-Med, Health-Chem or Medallion as subsidiaries. In response to a SEC inquiry, Briarcliff replied that exclusion of those entities was proper in light of Briarcliff's lack of control over their operations, minimal dividend rights and the ultimate reversion of control of their voting stock to Eckmar upon exercise of conversion rights.[18]
*502 While taxpayers are free to arrange their business affairs so as to minimize taxes, Gregory v. Helvering, supra, the arrangement must be one of substance and not mere form. Higgins v. Smith,308 U.S. 473 (1940). Because the moving party has the burden of proving that he is entitled to summary judgment, the evidence presented to the Court is always viewed in a light most favorable to the opposing party, and he is given the benefit of all favorable inferences that can be drawn from it. Adickes v. S. H. Kress & Co.,398 U.S. 144, 158-159 (1970); United States v. Diebold, Inc.,369 U.S. 654, 655 (1962). The clear inference of the exhibits submitted by respondent in opposition to petitioners' motion is that Briarcliff's acquisition of control of Health-Med and its subsidiaries lacked substance. The determination of whether a transaction had substance is a question of fact. See Gregory v. Helvering, supra at 470; Falsetti v. Commissioner,85 T.C. 332 (1985). Further, such a fact question is material as it tends to resolve an issue which has been properly raised. See Commodities Futures Trading Commission v. Savage,611 F.2d 270 (9th Cir. 1979). *503 In addition to the acquisition of control, for section 269 to apply, the principal purpose of the acquisition must be the "evasion or avoidance of Federal income tax." This question is a factual one which requires a subjective evaluation of petitioners' motives. Glen Raven Mills, Inc. v. Commissioner,59 T.C. 1, 14 (1972). Generally, summary judgment is not appropriate in cases where motive or intent is involved, as such a question typically involves a genuine and material factual issue. Espinoza v. Commissioner,78 T.C. 412, 417 (1982); Hoeme v. Commissioner,63 T.C. 18, 20 (1974). Because we find that there are unresolved questions as to material facts, summary judgment is not appropriate here. Accordingly, petitioners' Motion for Summary Judgment will be denied. An appropriate order will be issued.
Footnotes
1. This case was heard pursuant to section 7456 (redesignated at section 7443A by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) and Rule 180. All section references are to the Internal Revenue Code of 1954, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners couched their motion in terms of requesting the Court to declare that no deficiency is due because section 269 can never apply to the acquisition of a profitable corporation by a loss corporation. Respondent, at the hearing on this motion, objected to the motion on the grounds that it was a request for an advisory opinion. We will consider the motion as a request for summary adjudication of the issue of whether section 269↩ applies to the particular facts of the acquisition of Health-Med and subsidiaries by Briarcliff, and subsequent use of Briarcliff's net operating losses against the income of Health-Med and its subsidiaries. 3. At the time of filing the petition, the principal offices of Heath-Med Corporation and Health-Chem Corporation were located at New York, New York. The principal offices of the other petitioners were at various locations in the United States. ↩
4. Briarcliff was formerly known as Loft Candy Company. ↩
5. See note 4. ↩
6. In 1971, Briarcliff, pursuant to agreements with the Southland Corporation and its subsidiary, Barricini Stores, Inc., disposed of a substantial portion of its business and operating assets, terminated its manufacturing operations and sub-leased to Southland 70 retail candy store locations for the duration of the leases. Briarcliff's revenue during the fiscal year ended June 30, 1974 was principally derived from selling candy and associated items to its franchisees under the terms of its franchise agreements. The Southland Corporation was required under agreements with Briarcliff to provide candy and other items that Briarcliff needed to meet its obligation under the franchise agreements. ↩
7. This table was included in the petition and in respondent's Memorandum Brief in Opposition to Petitioner's Motion for Summary Judgment. We express no opinion as to the method of allocating the loss carryovers to the taxable years 1974 and 1975. ↩
8. The gross carryover from 1969 was $ 3,211,326, $ 973,861 of which was absorbed in the taxable year ended June 30, 1973. ↩
9. It is unclear whether the shares of preferred stock were acquired by Eckmar as part of the recapitalization or whether Eckmar owned the stock prior to the recapitalization. ↩
10. It appears that after the recapitalization, holders other than Eckmar and Briarcliff would hold preferred stock possessing approximately .01 percent of the total combined voting power. ↩
11. We note that the amounts of the claimed net operating loss deductions are greater than the amounts shown on the table, infra,↩ as loss carryovers to 1974 and 1975. This difference was included in the pleadings of both parties without explanation. In any event, the difference is not material to our decision herein. 12. Attachments to the notice of deficiency indicate that, in addition to the net operating loss adjustments, other adjustments were made to petitioner's taxes. Such adjustments were placed in issue by the pleadings. However, petitioners' motion deals exclusively with the net operating loss deductions. As such, petitioners' motion would more accurately be captioned as a Motion for Partial↩ Summary Judgment in that a decision in favor of petitioners would not dispose of all issues in this case. 13. Compare section 269(a), I.R.C. 1954, with section 129(a), I.R.C. 1939, as amended by section 122, Revenue Act of 1943, ch. 63, 58 Stat. 21. (Section 129(a) was carried over from the 1939 Code to the 1954 Code as section 269(a)↩ without material change). 14. Furthermore, petitioners' reliance on a Revenue Ruling is misplaced. Revenue Rulings of respondent speak to the limited fact situations before respondent at that moment. The acquisitions involved in Rev. Rul. 63-40, 1963-1 C.B. 46, were both cash acquisitions. The funds for the acquisitions were derived from the acquiring corporations' operations and shareholder capital contributions. In the present case, only a larger percentage of the purchase price was paid in cash, with the larger part paid in Health-Med preferred stock. Petitioners argued at the hearing on this motion that this structure constituted a financing arrangement whereby the purchase price would be paid over a period of eight years. We note that respondent, in limiting Rev. Rul. 63-40, stated that "No opinion is expressed as to other cases where the facts show that the purchase price is payable over a substantial period of time * * * or exceeds fair market value or where other circumstances may justify the application of section 269 of the Code." Thus, we believe that this case is outside the limited fact situation described in Rev. Rul. 63-40. We do not believe that Rev. Rul. 63-40 was broadly drafted to exclude every acquisition of a profitable corporation by a loss corporation. In fact, respondent expressly indicated that there may be be circumstances other than those discussed in the Ruling which would justify application of section 269. Even assuming the Revenue Ruling were directly on point, such Rulings merely set forth the views of respondent. Thus, they represent the views of one party to the litigation before the Court. As such, they do not constitute precedent by which this Court is bound. See Stubbs, Overbeck and Associates v. United States,445 F.2d 1142, 1146-1147↩ (5th Cir. 1971). 15. See note 10.↩
16. Although Temple Square Manufacturing Co. v. Commissioner,36 T.C. 88, 93↩ (1961) is contrary to petitioners' position, no attempt was made to distinguish that case. 17. While petitioners' taxable year ended on June 30, 1975, Briarcliff's Form 10K was filed "for the Fiscal Year ended June 28, 1975." ↩
18. Since there must be an acquisition of control for section 269 to apply, if at any trial of this matter the Court were to find that Briarcliff lacked control, it would appear that section 269 may not apply to the transaction. In any case, our duty in considering a motion for summary judgment is to determine whether any genuine issues of material fact exist rather than how factual issues should be resolved. Espinoza v. Commissioner,78 T.C. 412, 416 (1982); Matson Navigation Co. v. Commissioner,67 T.C. 938↩ (1977). We have found that there is a genuine issue of material fact regarding the question of control.