GORDON S. SORRELL, JR., AND JUNE M. SORRELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sorrell v. Commissioner
Docket Nos. 33652-83; 33653-83.[1]
United States Tax Court
T.C. Memo 1987-351; 1987 Tax Ct. Memo LEXIS 351; 53 T.C.M. (CCH) 1362; T.C.M. (RIA) 87351; July 21, 1987
*351 Held: With one exception, neither party has satisfied burden of proof with respect to the useful lives of various components of five housing projects, therefore, useful lives assigned in respondent's statutory notice are sustained; held further, investor services fee paid to general partner is a currently deductible expense of the partnership; held further, rent-up fees paid to general partner in 1977 for leases which began in 1978 are amortizable over the life of the leases to which the fees pertain, and are in no event deductible in 1977. Henry H. Hutchinson and Shapard D. Ashley, for the petitioners. Linda J. Wise, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On August 30, 1983, [2] respondent determined the following deficiencies and addition to tax for petitioners' taxable years ended 1977 and 1978: Addition to Tax
Year
Tax
[3] *352 Sec. 6651(a)(1)
1977
$ 6,364.48
--
1978
10,569.11 $ 1,584.88
After concessions [4] the issues for decision are: (1) Whether the useful lives of various components of five housing projects, assigned for purposes of determining depreciation deductions, are those determined by respondent's or petitioners' expert; and (2) whether a limited partnership is entitled to a deduction in 1977 for certain payments to its corporate general partner. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Gordon S. Sorrell and June M. Sorrell are individuals who resided in Huntsville and Birmingham, Alabama, respectively, at the time the petitions in this case were filed. June *353 M. Sorrell is a party because she filed jointly with Gordon S. Sorrell in 1977. During 1977 and 1978 Mr. Sorrell held general and limited partnership interests in five Alabama limited partnerships named Pepper Tree, Ltd., Bayou Bend, Ltd., Woodmere Apartments, Ltd., Stonebridge, Ltd., and Skyland Hills, Ltd. Each partnership was formed to develop and operate a residential apartment complex in either Mobile, Montgomery, or Tuscaloosa, Alabama. The projects were financed with Federal Housing Authority (FHA) insured mortgages pursuant to section 221(d)(4) of the National Housing Act or Section 8 of the United States Housing Act of 1937. [5]
Mr. Sorrell was also president and controlling shareholder of Southern Housing Partnerships, Inc. (SHP) during these years. SHP, an Alabama corporation engaged in the business of acquiring, developing, syndicating, and managing improved and unimproved real estate, was the managing general partner of each *354 of the earlier referenced partnerships. The primary dispute in this case involves depreciation deductions each partnership claimed for the various components of the apartment complexes. In determining depreciation deductions the partnerships uniformly assigned the following useful lives to the components: Assets
(in years)Life
Structures
33-1/3
Insulation, doors,
windows and drywalls  20
Plumbing and electrical
15
Roofing, heating and
air conditioning,  cabinets, specialities,  and land improvements  10
Carpets, drapes, appliances,
painting, furniture,  and fixtures  5 In the notice of deficiency for the year ended December 31, 1978, respondent determined that the useful lives of certain of the components were not accurate and made adjustments accordingly. Respondent disallowed petitioners' share of the partnerships' losses attributable to depreciation deductions based on inaccurate useful lives. In preparation for trial both parties secured experts who determined different useful lives than those set forth in the partnership tax returns and the deficiency notice. Petitioners and respondent now claim that the correct useful lives of the various components are those as determined by their *355 respective experts. [6]
The Projects
(1) Pepper Tree, Ltd.
Pepper Tree, Ltd. was formed on October 1, 1977, for the purpose of developing Pepper Tree Apartments, a 208-unit apartment complex in Mobile. The original sponsors and developers of the project were James E. Ladner, an experienced builder and developer in the Mobile area, and Ladner Construction Company, Inc. (Ladner, Inc.), a residential construction company managed by Ladner. Mr. Sorrell, SHP, Ladner, Inc., and Mr. Ladner were general partners of the partnership in 1978. Constructed in 1977 and 1978, the apartment buildings are two-story wood-framed structures built on concrete slabs. Exterior walls are stained-wood (masonite) with a one-inch thick band around the perimeter at the second floor level. The roof is asphalt shingled on a plywood deck and the exterior stairs and handrails to the second floor are constructed of pine or fir. Each apartment has central air conditioning and heating, wall-to-wall carpeting, self-lined drapes, and a kitchen equipped with range, refrigerator, and garbage disposal. Included in the complex are two accessory buildings with laundry and maintenance facilities, a cabana, *356 a rental office building, a large swimming pool, a small wading pool, and a clubhouse. Pepper Tree is located on University Blvd. between Airport Boulevard and Cottage Hill Road, near the University of South Alabama. The private placement memorandum for Pepper Tree, Ltd. provided that the complex would be located "in one of Mobile's fastest growing areas." Following the initial rent-up period, Pepper Tree was managed by Ladner Investment. In 1980 and 1981 the complex was managed by King-Meade Management Corporation, and Dalcor Management Group took over in 1983. In 1981 the project's maintenance operation was rated satisfactory by HUD. At that time the complex was in need of exterior painting; lawns and plantings needed some additional attention; screens needed replacing; and some repairs were needed in individual apartments. Some air conditioning compressors were replaced as needed that year, as were carpeting and doors. In addition over $ 7,000 was spent on lumber and materials to repair outside staircases. In 1983 many more external features of the complex were in need of correction. Wood used to construct exterior stairwells was rotting and some balconies needed replacing *357 where supporting members were rotting; some sliding panels had warped due to improper construction methods; some roofs had been damaged by storms and normal wear, and some were sagging due to improper support beams; gutters were in need of repair or replacement; and the asphalt paving was deteriorating in places. The interiors of the apartments were also in need of repair. Carpets were worn and needed replacing, and walls and ceilings needed painting and repair. Pepper Tree, Ltd. spent $ 42,000 for necessary capital improvements in the first quarter of 1983, including new carpets, drapes, dishwashers, a new wooden fence, and exterior and interior paint. In May 1983, over $ 7,000 more was spent on carpet replacement, and efforts were taken to improve the physical appearance of the project including painting the exterior of ten buildings; repairing all stairways and balconies; installing a new project sign; refurbishing 30 units, including new carpet, paint and wallpaper; refurbishing the office building; repairing the pool and installing a new pool fence; and installing fences around the garbage dumpsters. The apartment complex was sold in 1983. [7] *359 Since the sale extensive remodeling *358 work has been done by the new owners. The exterior has been repainted and the entire complex was relandscaped. The roof structure has been reinforced, stairways and balconies replaced, and the pavement has been resurfaced. Carpets and draperies have been replaced as has resilient flooring, and each apartment is being repainted with each change in occupancy. (2) Bayou Bend, Ltd.
Bayou Bend, Ltd. was formed on October 1, 1977, to develop Bayou Bend Apartments, a 104-unit complex located in Mobile which was financed with a 40-year mortgage insured by FHA. As with Pepper Tree, Ladner, Inc. was the contractor on the project and Ladner Investment Company was contracted to manage the rental of the apartments. Mr. Sorrell, SHP, Ladner, Inc. and Mr. Ladner were general *360 partners in 1978. The complex was constructed in 1977 and 1978 near the intersection of Brille Road and Dauphin Island Parkway, in South Mobile. The offering memorandum for the project provides that the site is well located, with interstate access, numerous neighborhood shopping facilities, churches, schools, and office facilities close by. The apartment buildings are two-story wood-frame structures built on concrete slabs. Exterior walls are stained-wood (masonite) siding with a one-inch thick band around the perimeter at the second floor level. Interior walls are stud-wall construction with gypsum board. The buildings have wood decks and steps from the second floor. The roof is asphalt shingled on plywood deck. Each apartment unit has central air conditioning and heating, wall-to-wall carpeting, self-lined drapes, and a kitchen equipped with a range, refrigerator, and garbage disposal. The complex includes two accessory buildings with laundry and maintenance facilities, a rental office, a swimming pool, a pier designed to accommodate 14 individual boats, a boat launching ramp, and a fenced boat storage area. In 1981 Bayou Bend requested approval of expenditures of over $ 5,000 *361 for the replacement of drapes and exterior repairs to buildings, including steps and balconies. In 1984 HUD inspectors found the complex maintenance operation unsatisfactory, and reported five pages of needed corrections with an estimated total repair cost of $ 57,895. At that time the facia, corner board, window trim, and horizontal band trim on all buildings had deteriorated; the hardboard siding was in very poor condition due to insufficient paint coverage and nailing; there was evidence of water leakage; window trim needed repair; gutters had pulled away from facia; the asphalt was deteriorating in parking areas throughout the project; railings, stairs, and porches were in very poor condition; lawn areas were in very poor condition; exterior painting was needed; carpet replacement in several units was required; drywall damage had occurred in some units due to leaks; and the play areas and equipment had been neglected. On October 15, 1984, Bayou Bend, Ltd. entered into an agreement to sell Bayou Bend. The purchaser agreed to make, cause to be made or commit to be made repairs or improvements to the complex if HUD required the same as a condition to granting approval of the sale, *362 provided that the aggregate cost was less than $ 60,000.
(3) Woodmere Apartments, Ltd.
Woodmere Apartments, Ltd. was formed on May 18, 1977, to purchase a 99-percent interest in Eastwood Apartments Company (Eastwood), an Alabama general partnership formed in 1976 for the purpose of developing a 200-unit complex in Montgomery. Eastwood had secured HUD endorsement for the apartment project and when Woodmere Apartments, Ltd. purchased its interest in Eastwood the project was renamed Woodmere Apartments. Mr. Sorrell and SHP were the general partners of Woodmere Apartments, Ltd. in 1977 and 1978. Other than Woodmere Apartments, Ltd., the partners of Eastwood were John C. Parker, A. Bowen Ballard, Eugene Ballard, Jr., and Steven D. Hughes. The Woodmere Apartments were constructed in 1977 and 1978. They are two-story wood-frame structures built on concrete slabs with an asphalt shingled roof. The exterior walls are imitation stone work/brick and rough-sawn wood. Each apartment has central air conditioning and heating, wall-to-wall carpeting, self-lined drapes and a kitchen equipped with refrigerator, range, dishwasher, and garbage disposal. [8] The complex also includes two recreation buildings *363 with laundry facilities and an office, two swimming pools, a tennis court, and a playground. In 1982, HUD conducted an inspection of the complex relative to a proposed transfer of physical assets. The inspectors rated the maintenance operation for the complex as satisfactory. The project needed maintenance and repairs to drives, parking lots, paving, curbs, lawns and plantings, electrical fixtures, the laundry room, the office, and tennis courts. Exterior and interior painting was also needed. HUD estimated the cost for these items at $ 51,215. Within a year of the date of the HUD inspection $ 1,315 had been spent on additional landscaping; some of the pot holes in the pavement had been repaired; $ 3,134.43 had been spent on repair of balconies and siding; 90 percent of the stairs and balconies had been repaired and painted; wallpaper had been added in some kitchens; carpeting had been replaced in some units; and 75 percent of the exterior doors had been repainted. The complex was *364 sold in June 1983 for $ 4,320,500. At that time it was represented in the Agreement of Purchase and Sale that all of the personal property and all improvements, including but not limited to machinery, structural components, roofs, mechanical systems, electrical systems, air conditioners, furnaces and heaters, partitions, fixtures, and equipment used in the general operation of the complex, were in good order and repair. [9] The Agreement also provided that in the event HUD required repairs or improvements as a condition to its approval of the sale, the purchaser would provide the same provided the cost did not exceed $ 50,000. (4) Stonebridge, Ltd.
Stonebridge, Ltd. was formed April 5, 1978, to develop the 248-unit apartment complex named Stonebridge Apartments in Montgomery. Mr. Sorrell, SHP, and S&W, Inc., the project contract, were general partners in Stonebridge. Construction off the apartment *365 complex took place in 1978 and 1979. The apartment buildings are two-story wood-frame structures built on concrete slabs with masonite siding and brick veneer. Each apartment has wall-to-wall carpet and self-lined drapes and each of the kitchens is equipped with dishwasher, range, kitchen exhaust fan, refrigerator, and garbage disposal. The complex includes two buildings with recreational facilities, a rental office, maintenance and laundry facilities, two swimming pools, and four tennis courts. The offering memorandum for the project states that the site is well located; it is contiguous to a middle-income residential community and accessible to shopping and to major thoroughfares. Stowers Service and Development Company was contracted to manage the apartments. When a tenant vacates the premises the management has the interior of the apartment repainted and the carpet cleaned or replaced as needed. The entire complex has been repainted and relandscaped since the original construction. In addition, some repairs to roofs have been required, and the pavement and sidewalks have deteriorated in places. In 1983 a problem with sagging floors in the living and dining rooms of second *366 floor apartments was identified. The floor framing and lightweight concrete had been improperly laid causing sheetrock sagging in first floor ceilings and second floor lightweight concrete breakage. Repairs were recommended accordingly. In 1984, the complex was in need of maintenance and repairs to many exterior items including walls, roofs, drives, sidewalks, stairs to second floor units, lawns, and drainage systems. HUD inspectors estimated the repairs would cost $ 23,015. At the time of trial Stonebridge, Ltd. had entered into an agreement to sell the apartment complex. [10] As part of the agreement, Stonebridge, Ltd. represented and warranted that the buildings and equipment constituting the project were structurally sound and in good repair taking into account age of the same and reasonable wear and tear. (5) Skyland Hills, Ltd.
Skyland Hills, Ltd. was formed June 1, 1978, for the purpose of developing a 100-unit apartment complex in Tuscaloosa named Skyland Hills Apartments. Mr. Sorrell, Hawkeye, Inc., the project developer, and SHP were general partners of the project. Constructed *367 in 1978 and 1979, the apartment buildings are single-story wood-frame structures built on concrete slabs with brick veneer. The roof is asphalt shingled on 1/2" plywood roof decking. The interior walls have stud-wall construction with gypsum board. Each kitchen is equipped with electric range/oven, refrigerator, dishwasher, and disposal. All units have air-conditioning and heating systems. The apartments were designed with special emphasis on facilities for the elderly and the handicapped. Approximately 70 percent of the units are occupied by elderly or handicapped individuals, and the remaining 30 percent by low income families. The complex includes a community building with office and vending area, and recreational and picnic facilities with grill area. The offering memorandum provides that the site is well located for elderly tenants due to accessibility to shopping facilities and major thoroughfares. The buildings, landscaping and paved areas of the complex have been maintained in good condition generally. The apartments do not have a high turnover rate and are therefore painted only every 2-3 years. On September 1, 1984, Skyland Hills, Ltd. agreed to sell the project. [11] *368 The Agreement of Sale provides that the seller represented and warranted that the buildings and equipment constituting the project were structurally sound and in good repair taking into account age of the same and except for reasonable wear and tear. (6) General Information
The HUD Handbook for Program Participants and HUD staff provides that the section 221(d)(4) program is meant to assist in financing projects designed to provide comfortable and attractive accommodations for occupancy by moderate income families with a priority in occupancy extended to those displaced by urban renewal or other governmental action. There is no restriction in occupancy by virtue of a tenant's income; maximum rates are determined on a project-by-project basis. All material aspects of projects proposed under the section 221(d)(4) and Section 8 programs are reviewed by FHA or HUD, including economic feasibility, location, type of units, rental rates, construction, operating budgets, management plan and architectural plans. In order to secure final endorsement of mortgage insurance, *369 a certificate is completed indicating that construction of the project is substantially complete and in accordance with the plans and specifications approved by the Federal Housing Commission. [12] The owners of such projects are required, pursuant to Regulatory Agreement, to maintain the premises, accommodations, and the grounds and equipment appurtenant thereto, in good condition. In addition, a management program is required for each project. The HUD Management Plan (Form HUD-9405) provides that the owner's management agent shall cause the project to be maintained and repaired in accordance with the management plan and local codes and in a condition at all times acceptable to the owner and HUD, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary. The Skyland Hills management plan is more specific: *370 5. a. The resident manager will make daily checks on all outside areas of the apartment and carry out necessary upkeep and maintenance. Each apartment will be completely inspected at the beginning or end of a lease agreement, or at one-year intervals whichever occurs first. This visit will include an inspection of all plumbing, heating, air conditioning and electrical equipment as well as the structural parts of the apartment and accessories and appliances. Any excessive wear, abuse, or malfunction will be noted and corrected as necessary and all routine service will be rendered. b. An inspection of the unit will be made 15 days prior to move out, and all the maintenance activities other than interior painting will be carried out prior to the move out date. c. Interior and exterior painting and redecorating will be done as often as is deemed necessary by the resident manager and managing agent. d. Garbage and trash removal will be handled by maintenance personnel. e. Major repairs will be handled on a contract basis with qualified contractors. f. Grounds upkeep and maintenance will be carried out by the maintenance help as needed. This maintenance will be under the supervision *371 of the resident manager. g. Common areas will be cleaned as needed by the maintenance man. h. Minor maintenance repairs will be handled by communication of the problem to the resident manager.
(7) Useful Lives Reports
The useful lives assigned to the various components by the partnerships were determined by Ron Carlson, a certified public accountant with experience in construction, budgeting, and management of real estate partnerships. Mr. Carlson considered the physical durability of the assets as well as their economic life. Specifically he considered the plans and specifications for the projects, the construction costs, expected tenant turnover, and climatic and soil conditions. Having been involved in more than 75 cost certifications for HUD projects, he relied on this experience, i.e., what he had seen in terms of wear and tear on components, to arrive at the assigned useful lives. At trial petitioners relied on the useful lives determined by Walter McKee, Jr. of the architectural firm Barganier, McKee, and Sims (BMS), who was assisted by Tommy Lawrence, the firm's cost estimator. Mr. McKee is involved in all aspects of the architectural firm's business. A registered architect *372 and graduate of Auburn University, he worked 9 years for two architectural firms in Montgomery and then spent 2 years working with a contractor and developer on office buildings, housing and shopping centers before forming BMS in 1974. At BMS he is the principal in charge of housing projects. Mr. Lawrence had been with BMS 1 year at the time the report was prepared. Prior to joining the firm he spent 11 years working in construction, with 6 of those as construction superintendent. McKee and Lawrence conducted personal interviews with apartment managers and made on-site visits to each apartment complex. In determining the useful lives they considered construction materials and workmanship, the location of each complex, and the "types of persons" who were residents of each complex. Their determination of the useful lives was based on the "economic useful life" of each component as of the date of construction. Mr. McKee uses the term "economic useful life" to describe the length of time it would be economical for each apartment complex to be run as a profitable business. In determining economic useful life in contrast to "physical life" Mr. McKee took into account the changes in the *373 neighborhood, market demands, and other variables affecting rentability. Other factors [13] considered were: (1) the quality of construction materials, with emphasis on durability; (2) wear and tear, and decay or decline from natural causes; (3) the normal progress of the art, economic changes, inventories and current developments within the multi-family housing industry; (4) climatic and other local conditions peculiar to each apartment complex; and (5) the partnerships' policies as to repairs, renewals, and replacements. Respondent claims the correct useful lives are those assigned by Dwight D. Stanley, Leo T. Pelek, and William M. Shrader in their expert report. Mr. Stanley prepared the report on the basis of discussions with Mr. Pelek and Mr. Shrader, who actually inspected the complexes. [14] Their report is a computerized statement which sets forth the pertinent data considered in determining a useful life. The report contains a standardized list of components, derived from cost estimate sheets for HUD projects. The only variables in the report are the useful lives of the components. *374 Relying on his knowledge and experience, Mr. Stanley assigned useful lives to the components after considering each from an economic, physical, and functional standpoint. Payment to General Partner
During 1977 Woodmere, Ltd. *375 paid SHP a total of $ 29,000. [15] Claiming that $ 15,000 was paid for an investor services fee and $ 14,000 for "rent-up" fees, the partnership deducted the amounts as guaranteed payments. [16]
The Limited Partnership Certificate and Agreement for Woodmere provides for the Rights and Duties of the General Partner as follows, in part: 6.1. * * * The General Partner shall manage and control the affairs of the Limited Partnership to the best of its ability and shall use its best efforts to carry out the business of the Limited Partnership set forth in Article IV, and in connection therewith the powers of the General Partner include, but are not limited to, the power and discretion and authority to: * * * (c) Manage, operate and develop any Limited Partnership property and enter into operating agreements with others with respect to properties acquired by the Limited Partnership containing such terms, provisions and conditions as the General Partner shall *376 approve; * * * (g) Maintain, at the expense of the Limited Partnership, adequate records and accounts of all assets, liabilities, operations and expenditures and furnish the Limited Partners with annual statements of accounts as of the end of each Partnership fiscal year, together with suitable tax reporting information; * * * 6.2. The General Partner shall devote such time to the Limited Partnership business as it, in its sole discretion, shall deem to be necessary to manage and supervise the Partnership business and affairs, and the General Partner shall receive an Investor Services Fee as compensation, in the amount of $ 15,000 annually for each of the years 1977, 1978, 1979, 1980 and 1981 (an aggregate of $ 75,000). [Emphasis added.] The Fee shall be paid not later than December 31 of the year for which the Fee is due. In addition to such Investor Services Fee the General Partner shall be fully reimbursed for any expenses incurred by the General Partner in connection with the furtherance of Partnership business upon the furnishing by the General Partner to the Partnership with invoices or other evidences of payment as the accountant for the Partnership may deem to be necessary *377 or appropriate. 6.3. The General Partner and any affiliates of the General Partner shall receive, as compensation, in addition to any sums receivable by the General Partner by reason of the General Partner's profit and loss interest under Articles X and XI or its ownership of an interest in the Limited Partnership, or as provided elsewhere in this Agreement, the following items of compensation: (a) For the operation and management of any Limited Partnership property, a sum equal to the maximum allowed by FHA for such management and operation under FHA Regulations, provided that if the General Partner shall, pursuant to subparagraph 6.1.(c) of this Article, contract with any other party to provide such operation and management services, then any such fees paid to such third party shall be deducted from the General Partner's compensation set forth in this subparagraph: (b) For the General Partner's services in handling initial rental of the apartment units the General Partner shall receive a fee of One Hundred Fifty Dollars ($ 150) per rental unit for each 12-month lease thereof, or a prorated fee in the instance of any shorter initial leases (e.g., $ 75 for a six-month's lease). *378 This rent-up fee shall be separate from the Investor Services Fee provided in subparagraph (a) hereof and such fee shall not be subject to the limitations set out in subparagraph (a) above. All costs incurred in handling such initial rental, including advertising, media expense, sales training expense and commissions shall be borne by General Partner or its assigns. [Emphasis added.] (c) Such developer's profit, not to exceed $ 56,000 in any event, as may be realized by the General Partner from the development and construction of Woodmere apartments consisting of 200 apartment units to be constructed in Montgomery, Alabama. * * * * * * 6.4 (a) At all times during the existence of the Partnership, the General Partner shall keep or cause to be kept full and true books of account, on a calendar year basis, in which shall be entered fully and accurately all transactions of the Partnership. * * * (b) The General Partner shall have income tax returns prepared for the Partnership by a Certified Public Accountant selected by it from time to time, and a report indicating the respective Limited Partners' share of the net profit or losses and capital gains or losses and other items required *379 by federal tax law to be separately allocated to each Partner, all as defined and reflected on said Partnership income tax return, shall be distributed to the Partners within ninety (90) days after the close of the taxable year or period of the Partnership for which such return was prepared. * * * The Amended and Restated Articles of Partnership for Eastwood, Ltd., provide, in part, as follows: 12. The Individual Partners agree that they will cause Ballard Realty Company to enter into a two (2) year Management Agreement with the Partnership, which Management Agreement shall commence during the initial rent-up period on such terms and conditions as are customarily approved by HUD in their standard form Management Agreement for similar projects for fees not in excess of those permitted by HUD. The Managing Agent's responsibility shall include, but not be limited to: (a) overseeing the total operation of the project, (b) hiring the management and maintenance personnel for the project, (c) coordinating with the Partnership accountant, (d) providing the necessary and proper reports for the Partnership, (e) initiating and coordinating all advertising and promotional campaigns, (f) supervising *380 the leasing of the apartments and collection of rents, (g) supervising repairs and maintenance, and (h) generally to provide all continuing supervisory functions which eliminate the need of the Partnership providing day to day management decisions. The Private Offering Memorandum for Woodmere provides as follows relative to the management of the partnership and the apartment complex: Management by General Partner - The General Partner has the exclusive right and authority to manage the Partnership and to operate and conduct the business of the Partnership. The General Partner is required to devote such time and effort to the Partnership business as is necessary to promote adequately the interest of the Partnership * * *. Because the General Partner will be involved in other business ventures it will not devote its full business time to the affairs of the Partnership. The General Partner does not anticipate devoting a material portion of its time to the business of the Partnership. Southern Housing Partnership, Inc. will however provide administrative and management services for the Partnership and will receive a service fee for providing such services. [Emphasis added.] * * * Managing *381 General Partner - * * * Woodmere is the initial project of the corporation so SHP has no prior experience in serving as managing General Partner. The General Partner hopes to benefit from the past experience and expertise of the management of Eastwood Apartment Company, who has developed other Section 221 D-4 apartment projects and has served as General Partner with full fiduciary responsibility to the investors. Eastwood Apartment Company, owned and managed by the principals of Ballard Realty Company, will assist SHP in management and development of the complex until "final FHA endorsement" of the project has been obtained after construction completion. In effect, from initial FHA endorsement to final FHA endorsement Eastwood Apartment Company will "manage" the development of the project under the supervision of the General Partner. * * * * * * Property Management - Ballard Realty Company - The General Partner will retain Ballard Realty of Montgomery to manage the rental of the apartments. Initial rent-up will be under the supervision of Southern Housing Partnerships, Inc. [Emphasis added.] The Private Offering Memorandum for Woodmere provides as follows relative to the "rent-up *382 fees": * * * The rent-up contract obligates SHP to commence obtaining leases upon completion of construction of the first apartment building, with a 12-month time period in which to obtain the agreed percentage of occupancy, after which time management is the responsibility of Ballard Realty. In the statutory notice for the taxable year ended 1977 respondent disallowed deductions attributable to the payments "because it has not been established that any amount is deductible within the meaning of section 162 of the Internal Revenue Code. These amounts are capital expenditures amortizable over a period of 498 months." OPINION
Issue 1
Initially we must address petitioners' argument with respect to the burden of proof. Petitioners claim that by relying on the expert witness report prepared for trial respondent effectively rejected the statutory notice, [17] and therefore the notice no longer carries the presumption of correctness usually afforded it pursuant to Rule 142(a). Respondent contends that the statutory notice continues to carry its presumption of correctness and petitioner must prove that the useful lives of the components are less than those as determined in the notice. The *383 only burden respondent accepts is that of proving useful lives greater than those set forth in the statutory notice. [18]
We agree with respondent. Reliance on the useful lives assigned in the expert report is not a rejection of the statutory notice. The issue respondent raised in the notice is the determination of the correct useful lives of the various components of the apartment complexes. Respondent has not abandoned the notice by modifying the original determination based upon an expert report obtained in preparation for trial. Furthermore, the change in useful lives does not constitute a new matter raised at trial. See, e.g., Estate of Cordeiro,51 T.C. 195, 203 (1968); compare Papineau v. Commissioner,28 T.C. 54 (1957). [19]
Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income. *384 Complex structures such as buildings may be depreciated using the component method, i.e., the major components may be placed in separate accounts and depreciated over the useful life of each particular component.[20] The determination of the components' useful lives and the reasonableness of depreciation deductions taken in conjunction therewith are questions of fact. Merchants Nat. Bank v. Commissioner,554 F.2d 412, 415 (10th Cir. 1977); Matson Navigation Co. v. Commissioner,67 T.C. 938, 944 (1977); Casey v. Commissioner,38 T.C. 357, 381 (1962). This determination must be based upon facts that were known or could reasonably have been anticipated at the time the returns were filed for the years in issue. New England Tank Industries, Inc.,50 T.C. 771, 781 (1968), affd. per curiam 413 F.2d 1038 (1st Cir. 1969); Casey v. Commissioner, supra.
The useful life of an asset is that period for which the asset may reasonably be expected to be employed in the taxpayer's business. Massey Motors, Inc. v. United States,364 U.S. 92 (1960); [21] *385 Honodel v. Commissioner,722 F.2d 1462 (9th Cir. 1984), affg. 76 T.C. 351 (1981). Respondent's regulations provide in part: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience *386 forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * * [Sec. 1.167(a)-1(b), Income Tax Regs.] We have carefully considered the entire record including the testimony of Mr. Sorrell, Mr. Carlson, the project managing agents, and the experts secured for trial, and over 100 stipulated exhibits. Despite the voluminous record however, and with one exception, we hold that neither party has proven that the components' useful lives are other than those determined in the statutory notice. [22]
In urging us to adopt the useful lives assigned by Mr. McKee, petitioners maintain that multi-family structures such as those involved are constructed with the least-skilled laborers and minimum grade materials and that *387 as a result the complexes are extremely poorly constructed. The poor construction, petitioners allege, has led to rapid deterioration of the projects and increased repair costs, and there is a probability that in 30 years extensive repair or rebuilding will be required. Furthermore and most importantly, petitioners contend, economic conditions including changes in the rental market will cause the apartments to outlive their usefulness after a period of 30 years. We find the evidence in support of petitioners' claims to be insufficient due to its general and speculative nature. We simply are not convinced that petitioners' experts' conclusions are supported by their knowledge and experience, the record, or facts that were known or could reasonably have been anticipated at the end of the taxable years in question. See New England Tank Industries, Inc. v. Commissioner, T.C. at 781. We are not satisfied that Mr. Sorrell, Mr. Carlson, or Mr. McKee possessed knowledge or information with respect to these complexes or any other HUD/FHA projects that would support petitioners' position with respect to the poor construction. [23] *389 In fact there was testimony to the effect that the materials *388 used to construct FHA financed projects are the same quality as those used to construct privately financed projects. [24] Furthermore each project was reviewed by HUD/FHA authorities and all of the developers agreed to construct the complexes in accordance with HUD/FHA specifications and local building codes. Based on these facts we see no justification for attributing unusually short useful lives to the apartment complex structures or the other project components. In addition, petitioners have not persuaded us that economic conditions would justify shorter useful lives. An expert's opinion is entitled to substantial weight only if it is supported by the facts. Casey v. Commissioner,38 T.C. at 381. The facts in this case do not support the conclusion that the apartments will outlive their usefulness in 30 years. Such a conclusion is based on mere speculation that more complexes will be built and competition will increase, [25] and is insufficient to prove that the normal useful lives should be reduced. See, e.g., University City, Inc. v. Commissioner,T.C. Memo. 1979-198, affd. without published opinion 661 F.2d 943 (9th Cir. 1981). We recognize that there is ample evidence that the complexes required major repairs to or replacements of many components at points in time before the useful lives assigned to them had expired. We also note that painting was required earlier than 10 years *390 as was assigned to the painting component in respondent's statutory notice. However, with the exception of the painting, petitioners have not proven that problems with any of these components could have been predicted at the end of the taxable year in question or that economic factors would justify shorter useful lives. For example, problems with exterior siding were attributed to improper construction. Had the siding been adequately attached, as required by the construction specifications, the problems should not have occurred, and thus would not have been anticipated. Similarly, problems with pavement deterioration were attributed to gumbo soil and improper treatment of the soil before paving. Had the proper procedure been followed we assume these problems would not have been anticipated. Instead, based on the representations in the limited partnerships' private offering memoranda, the developers' agreements to properly construct the projects, and the HUD maintenance requirements, we are convinced that with the exception of painting [26] the problems that were encountered would not have been predicted when these projects were constructed. [27] *392 Accordingly, petitioners lack sufficient *391 evidence to support the shorter useful lives claimed. Respondent has not satisfied his burden either. We are concerned with the reliability of respondent's expert report and testimony, specifically with respect to whether conclusions were drawn on the basis of adequate and accurate examinations of the apartment complexes involved. We cannot, as respondent seems to suggest, merely overlook the fact that on two occasions the wrong complexes were examined. Nor can we overlook the fact that one of the inspectors failed to note the damage to the roofs at Pepper Tree. [28] Furthermore, one of the inspectors testified that he did not look at the original plans or specifications of any of the units, but relied instead on information in a HUD guide. He also testified that he was unaware that the Woodmere complex had undergone substantial restoration when he inspected it. In light of these events, we are not convinced that the information used as the basis of the expert report is accurate and we have given little weight to the conclusions contained therein. Even if we were satisfied that the report *393 was based on accurate information, we would not be satisfied that the useful lives assigned are supported by the contents of the report or by any other evidence of record. Since, with the exception of the painting component as noted earlier, neither petitioners nor respondent have convinced us that the useful lives of the components are less than or greater than those in the statutory notice, the useful lives in respondent's statutory notice are sustained.
Issue 2
Petitioners contend that Woodmere, Ltd. properly deducted as guaranteed payments pursuant to section 707(c), the $ 15,000 payment to SHP for services relating to the management of the partnership during 1977 and the $ 14,000 payment for efforts in connection with the soliciting and securing of tenants for the apartments. Respondent contends that these payments are capital expenditures amortizable over a period of 498 months. [29] *394 *395 *396 Section 707(c) provides that "to the extent determined without regard to the income of the partnership, payments to a partner for services * * * shall be considered as made to one who is not a member of the partnership, * * * subject to section 263, for purposes of section 162(a) (relating to trade or business expenses)." It is well settled that the requirements of section 162(a) *397 must be met in order for the partnership to deduct a payment as a guaranteed payment. See Cagle v. Commissioner,63 T.C. 86, 96 (1974), affd. 539 F.2d 409 (5th Cir. 1976). In addition, even if the partnership is not yet "carrying on a trade or business" as required by section 162(a), guaranteed payments under section 707(c) may still be deductible under section 212. Although the partnership is not allowed a deduction under section 212, a partnership can incur expenses that may be deducted by an individual partner under section 212. Sec. 1.702-1(a)(8)(i), Income Tax Regs.; Rev. Rul. 75-523, 1975-2 C.B. 257. Durkin v. Commissioner,87 T.C. 1329, 1388 n. 19 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1058 n. 21 (1986). In determining whether payments are currently deductible we look to the nature of the services performed rather than to their designation or treatment by the partnership. Doyle v. Mitchell Bros. Co.,247 U.S. 179, 187 (1918); Durkin v. Commissioner, supra;Cagle v. Commissioner,63 T.C. at 96. [30] We are constrained to consider the substance of the fees and not their form. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Gregory v. Helvering,293 U.S. 465 (1935); *398 Egolf v. Commissioner,87 T.C. 34, 43 (1986). The record before us establishes that the payment to SHP for investor services was a currently deductible expense of the partnership rather than a capital expenditure. According to the undisputed testimony of Mr. Sorrell and the terms of the offering memorandum and partnership agreement, SHP supervised the property manager who was employed to handle day-to-day management of the apartments, reviewed annual budgets and corrected the budgets as needed, coordinated matters with HUD relative to the operations of the apartments, did internal bookkeeping and accounting for Woodmere and Eastwood, and communicated periodically with the limited partners via correspondence, telephone conversations, and personal meetings. These services all pertain to day-to-day or year-to-year operations of the partnership. Compare Cagle v. Commissioner, supra;Tolwinsky v. Commissioner,86 T.C. 1009, 1058-1059 (1986). We reject respondent's substance over form argument that the partnership agreements and offering memorandum were drafted to avoid what would normally be characterized as capital expenditures. See, e.g., *399 Egolf v. Commissioner, supra. Respondent contends that with the exception of communications with limited partners, the services performed by SHP were duplicated by the property manager for day-to-day management of the complexes and that SHP in reality must have been compensated for the organization and syndication of Woodmere, Ltd. or for the acquisition of the partnership's interest in Eastwood. On the record before us we cannot agree. Compensation to general partners for organization of the partnership and to the property managers for day-to-day management of the complexes was provided for apart from the investor services payments. [31] *400 Furthermore, there was undisputed testimony that the investor services fee was reasonable for the services provided and the size of the project involved. In addition the documents and testimony establish that SHP, as managing partner, had the risks and responsibilities of management above and beyond the day-to-day responsibilities associated with the management of the apartment complex. [32]
Respondent further argues that *401 even if the investor services fee is a current expense it is not deductible under the "pre opening expense doctrine." See Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965); Hoopengarner v. Commissioner,80 T.C. 538, 540 (1983), affd. without published opinion 745 F.2d 66 (9th Cir. 1984). Under that doctrine deductions for expenses incurred prior to the time that a business begins to function as a going concern and performs those activities for which it was organized are precluded by section 162(a). Richmond Television Corp. v. United States, supra.
We agree with respondent that the preopening expense doctrine would preclude deductions for payments under section 162(a) in 1977 since the Woodmere Apartments were not occupied until 1978. See Goodwin v. Commissioner,75 T.C. 424 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982). However, in Hoopengarner we held that the preopening expense doctrine does not apply to amounts deductible under section 212 which are paid or incurred for the management, conservation, or maintenance of property held for the production of income.[33] Here, since the apartments were not occupied until 1978, the partnership *402 was merely holding property which would in the future be income producing. The fee incurred was for the management of such property and is therefore deductible under section 212. Sec. 1.212-1(b), Income Tax Regs.Hoopengarner v. Commissioner, supra.
With respect to the $ 14,000 "rent-up" fee respondent argues that since the Woodmere apartments were not occupied until 1978, the fee for obtaining the leases which began in 1978 is not deductible in 1977. Citing Zanivovich v. Commissioner,616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1978), petitioners argue that in this case the rent-up fees pertained to leases that were for periods of 6 months to 1 year after the *403 year paid and that therefore they fall within the "one year rule" and are deductible in 1977. [34]
In Zaninovich the Ninth Circuit considered the application of section 1.461-1(a)(1), Income Tax Regs., to a prepaid rent expense. The Court adopted a "one-year rule," allowing a full deduction in the year of payment where an expenditure creates an asset having a useful life which extends beyond the year of payment for a period of one year or less. The Court held that under section 1.461-1(a)(1) of respondent's regulations the taxpayer who paid rent on December 20, 1973, for the period from December 1, 1973, to November 30, 1974, could deduct the entire *404 rental payment on his 1973 tax return. The "one-year rule" was used to distinguish between currently deductible expenses and capital expenditures having a useful life substantially beyond the close of the taxable year. Since an appeal in this case lies in the Eleventh Circuit, we are not required to adopt the Ninth Circuit's one-year rule, and we refrain from commenting on its application to these facts. The payment for rent-up services which related to the acquisition of the leases is a capital expenditure, amortizable over the life of the leases, i.e., in this case no earlier than 1978 since the leases began in that year. See Renwick v. United States,87 F.2d 123, 125 (7th Cir. 1936); Meyran v. Commissioner,63 F.2d 986 (3d Cir. 1933). [35] The short term of the leases does not change this result. See section 1.461-1(a)(1), Income Tax Regs.[36] *405 Accordingly, no deduction for the rent-up fee is allowable in 1977. Accordingly, no deduction for the rent-up fee is allowable in 1977. Decision will be entered under Rule 155.
Footnotes
1. On October 23, 1984, docket Nos. 33652-83 and 33653-83 were consolidated for purposes of trial, briefing, and opinion. ↩
2. Petitioners Gordon and June Sorrell received two identical notices of deficiency for the year ended December 31, 1977, dated August 20, 1983, and October 5, 1983. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.
4. On brief petitioner concedes liability for the addition to tax under sec. 6651(a)(1) for failure to timely file a return. The addition to tax is equal to 5 percent of the amount required to be shown as tax on such return (reduced if necessary according to sec. 6651(b)) per month or fraction thereof during which such failure occurred, not exceeding 25 percent in the aggregate and taking into account any extensions of time for filing said return. Sec. 6651(a)(1). ↩
5. The Department of Housing and Urban Development (HUD) administers both programs. All of the projects were financed with mortgages insured under the section 221(d)(4) program except Skyland Hills, which was financed through the Section 8 program. ↩
6. See Appendix A.↩
7. The Real Estate Purchase Agreement provides in part: SELLER'S REPRESENTATIONS AND WARRANTIES
* * * 3.6 Condition of Property. The Subject Property, including but not limited to all of the mechanical systems, plumbing, electrical wiring, appliances, fixtures and equipment, air conditioning units, heaters, equipment, roofs, structural members, furnaces, utilities, all furniture or furnishing located in and upon the Subject Property has, to the best of Seller's knowledge and belief, no structural or other material defects other than those disclosed by Purchaser's inspection and same will be in good, safe operating condition at the time of Closing. The parties hereto specifically acknowledge that the above representation excludes roofs, balconies and steps at the property, which are generally in the renovation and repair. * * * 13.13 Repair Escrow.↩ The Purchaser agrees that it will, if required by FHA and/or HUD as a condition to approving the transfer of physical assets, contemplated herein, escrow at closing a sum not to exceed ONE HUNDRED THOUSAND DOLLARS ($ 100,000) to be used for repair and improvements to the subject property. Said escrow shall be in a financial institution chosen by Purchaser, but subject to HUD approval. If HUD and/or FHA require the escrow of a sum greater than $ 100,000, Purchaser may either escrow said funds or terminate this Agreement at which time it shall receive its earnest money from the escrow agent and this Agreement shall become null and void and of no further force and effect. Seller shall not be obligated to contribute any sums of money to this escrow account.
8. At the time the complex was built these amenities were considered "state of the art." Now complexes offer added features such as microwaves, double pane windows, and different carpeting and wallpaper. ↩
9. The Agreement also provided that each apartment was equipped or furnished with a working refrigerator, range, dishwasher, air conditioning, heating, plumbing, hot water equipment, carpeting, and window treatments in good condition, and each apartment was reasonably decorated and fixtured.↩
10. Petitioners note on brief that as of the date of the brief the sale under the agreement was not closed.↩
11. On brief petitioners state that this agreement was subject to a number of contingencies and the sale was not consummated.↩
12. In this case the developer for each project agreed to construct the project in accordance with HUD specifications and the private placement memorandums for the projects provide that the quality of construction was to meet or exceed local building codes and FHA Property Standards. ↩
13. These factors are set forth in respondent's regulations. See sec. 1.167(a)-1(b), Income Tax Regs.↩
14. Mr. Stanley inspected the premises after the report was completed and submitted to respondent. He made no changes to the report after visiting the sites himself. Respondent's experts examined the wrong complex on two occasions. With respect to Bayou Bend, since the name of the complex had been changed to The Landing and the complex next to The Landing is called Bayou Bend, the experts were uncertain as to which complex was the one in question. Consequently, both were examined. The experts also examined a complex other than Skyland Hills in Tuscaloosa. The name Skyland Hills Apartments was changed to McConnell Hills. The experts thought the complex viewed was built in 1978 when Skyland Hills was built, when in fact the complex viewed was built in the late 1960's. Later upon discovering this error, the experts returned and inspected the correct complex. After this examination they determined that the useful lives initially determined were still valid.↩
15. The parties stipulated this amount was $ 34,000. ↩
16. In the notice of deficiency for the year ended December 31, 1977, respondent disallowed petitioners' share of the taxable loss of Woodmere Apartments, Ltd. attributable to this deduction. ↩
17. See Appendix A for comparison of useful lives. ↩
18. Respondent made an oral motion at trial to amend the answer to reflect the useful lives given in the expert report. ↩
19. And compare Goldstein v. Commissioner,T.C. Memo. 1975-355↩. 20. See, e.g., Shainberg v. Commissioner,33 T.C. 241↩ (1959). 21. See also Dean v. Commissioner,T.C. Memo. 1970-75↩. 22. See, e.g., Estate of Randolph v. Commissioner,T.C. Memo. 1970-324↩. 23. Compare Laney v. Commissioner,T.C. Memo. 1979-491, affd., revd. and remanded 674 F.2d 342 (5th Cir. 1982). Mr. Sorrell specializes in tax shelters and investments. However, we are not convinced he possessed any specific knowledge or expertise with respect to the quality of construction of the investments he managed. Furthermore, from the record it appears as though these complexes were his first HUD/FHA projects. Similarly, although Mr. Carlson may have been involved in cost allocations for over 75 HUD projects, we have no indication that he is knowledgable about the construction and useful lives of the components for which he has allocated such costs. Although Mr. McKee is principal in charge of housing projects, we have no indication that he is knowledgable about the useful lives of components. 24. We refer here to structural components. Fixtures and furnishings may vary more significantly. ↩
25. At the time the complexes were constructed they were considered very rentable. ↩
26. With respect to painting, the partnerships initially assigned a 5-year useful life to this component and respondent initially determined a useful life of 10 years. At trial petitioners claimed a useful life of 3 years for painting for all complexes except Skyland Hills, to which they attributed a 5 year useful life for painting. We find sufficient support in the record to justify an expectation of the need to repaint the projects before 10 years. In addition we find sufficient support to divide the painting component between interior painting and exterior painting. Accordingly, for all of the projects except Skyland Hills we assign to exterior painting a useful life of 6 years, and to interior painting a useful life o 3 years. With respect to Skyland Hills we assign a useful life to exterior painting of 7 years and to interior painting 3 years. If the parties are unable to make said allocation pursuant to Rule 155, they are directed to use the longer of the useful lives we have assigned. ↩
27. Although petitioners stress that high tenant turnover was anticipated due to some of the apartment complex locations and the moderate income tenant base, we are not convinced that this factor supports shorter useful lives than assigned in the statutory notice for components affected. 28. While the damage itself may not have changed the expert's opinion as to the useful life of the roof since the problem arose after construction, we are still concerned that the expert did not inspect the roof more closely. ↩
29. The statutory notice for the year ended December 31, 1977, gives the following explanation for respondent's adjustments: The amount of $ 29,000 claimed as guaranteed payments to partners is not allowed because it has not been established that any amount is deductible within the meaning of section 162 of the Internal Revenue Code. These payments are capital expenditures amortizable over a period of 498 months. Therefore, your taxable income is increased in the amount of $ 29,000.00. On brief respondent raises the following issues with respect to the $ 29,000 payment: A. Whether $ 14,000.00 designated rent-up fees is currently deductible under I.R.C. § 707(a) or § 707(c) as an ordinary and necessary business expense. Whether the $ 14,000.00 is a capital expenditure subject to amortization any part of which can be claimed in 1977. B. Whether the $ 15,000.00 designated as an investors service fee is deductible under I.R.C. § 707(a) or § 707(c). 1. Whether the services SHP was to perform for such fee were within the normal scope of a general partner's duties and, therefore, not within the scope of section 707(a). 2. Whether the investor's service fee constitutes a guaranteed payment to a partner within the meaning of I.R.C. § 707(c); and, if so, whether it constitutes a currently deductible expense. a. Whether the services rendered by SHP were for the acquisition of a partnership capital asset and must be capitalized under I.R.C. § 263. In the alternative if such fee is determined to be for services that could qualify for a current deduction,
b. Whether SHP actually performed any services of a nature to generate a current deduction; and, if so, whether the payment for such services was reasonable.
c. Whether any part of such payment is for future services. C. Whether such payments to SHP in 1977 constitute nondeductible pre-opening expenses. [Emphasis added.]
The only issue raised in the statutory notice was whether the payments in 1977 were currently deductible expenses or capital expenditures. Respondent's determination pertains to the nature of the services involved, rather than whether the payments were made, whether the services were rendered, whether payments were reasonable, or whether payments were for future services. Assuming respondent intended to pursue these additional issues, however, petitioners addressed the positions on brief. Petitioners requested, though, that respondent be limited to the issue raised in the notice of deficiency. It is well settled that factual issues not pleaded in the original pleadings or raised by proper amendment but raised for the first time at trial or on brief will not be considered by this Court. Polk v. Commissioner,31 T.C. 412 (1958), affd. 276 F.2d 601 (10th Cir. 1960); Ronan State Bank,62 T.C. 27↩ (1974). Accordingly, we limit our discussion to a determination of the nature of the services for which payments to SHP were made in order to determine whether the payments were currently deductible expenses. In this case, even though petitioners addressed the additional issues on brief, with the exception of the "reasonableness" of the payments in question, petitioners did not have the opportunity to respond and present evidence as to the additional factual issues raised at trial. 30. Gaines v. Commissioner,T.C. Memo. 1982-731↩. 31. The private placement memorandum indicates that the property manager was to receive 5 percent of the gross rents. Furthermore the private placement memorandum indicates that the general partners were to receive 4 percent of the partnership's net profit and losses and upon liquidation of the partnership 25 percent of the capital accounts once the limited partners' capital accounts were restored.
32. We recognize that the $ 15,000 per year payment was to cease after 5 years (compare Tolwinsky v. Commissioner,86 T.C. 1009↩ (1986). Since the managing partner maintained the same responsibilities after this period lapsed, perhaps the total $ 75,000 was attributable to a longer period. However, due to the untimeliness of respondent's argument that the payment is attributable to future services, we will refrain from commenting on this point. In addition, it appears from Mr. Sorrell's testimony that some of the services were to be performed after construction was complete. Thus we do not have a clear indication as to which of the services covered by the fee were performed in 1977. However, assuming all of the services are of the type generating a current expense, and in light of the fact that respondent did not raise this issue prior to trial, we need not ascertain which were performed in 1977 and which in 1978. 33. We have made it clear that we have considered and rejected respondent's argument that we should reconsider our holding in Hoopengarner.See Johnsen v. Commissioner,83 T.C. 103, 115 (1984), revd. 794 F.2d 1157 (6th Cir. 1986); Lewis v. Commissioner,T.C. Memo. 1986-155; Fishman v. Commissioner,T.C. Memo. 1986-127. We note that the Sixth and Eighth Circuit Courts of Appeals have declined to follow Hoopengarner. Johnsen v. Commissioner, supra;Aboussie v. United States,779 F.2d 424, 428-429↩ n. 6 (8th Cir. 1985). 34. We note that according to the partnership agreement, the rent-up fee was to be paid at $ 150 per 12-month lease. Mr. Sorrell recalled that approximately 35 leases had been approved in early January 1978. Assuming each lease was for 12 months, the amount of payment under the agreement would have been $ 5,250. Petitioners argue that whether the $ 14,000 actually paid was greater than the terms provided by the agreement should not affect the result herein since respondent did not challenge the amount in question prior to trial and briefing. ↩
35. See Rev. Rul. 81-161, 1981-1 C.B. 313↩. 36. It appears that the payment in 1977 may have been prepayment of the fee due to SHP for services relating to the rent-up of the apartments. Mr. Sorrell recalled that "in early January [1978] 35 leases had been approved" and did not recall whether any had been approved in 1977. According to the terms of the limited partnership agreement and the private placement memorandum, SHP was to receive $ 150.00 for each 12-month lease. (This amount was to be prorated for shorter-term leases.) None of the leases began before 1978 and we see nothing in the agreements which required payment before the leases were entered into. Since respondent did not raise the prepayment issue before trial, but instead focused on whether the payment was for an expense or capital expenditure, we refrain from deciding the issue on this basis. We note however that cases involving voluntary prepayments are distinguishable from the required prepayments found in Zaninovich and are not subject to the "one-year rule." See Bonair Development Co. v. Commissioner,679 F.2d 159↩ (9th Cir. 1982).